United States Court of Appeals
Fifth Circuit

**F I L E D**

**November 18, 2005**

Charles R. Fulbruge III
Clerk

UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 04-11065
_____


UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

RAFAEL MENDEZ,

Defendant-Appellant.

---

On Appeal from the United States District Court
for the Northern District of Texas, Dallas Division

---

Before DAVIS, JONES, and GARZA, Circuit Judges.

By EDITH H. JONES:

Rafael Mendez, convicted of harboring illegal aliens, appeals only from the district court's denial of his motion to suppress evidence. He challenges the constitutionality of law enforcement officers' entry of his home and investigation to confirm the presence of illegal Brazilian immigrants. We hold that the government agents' investigatory procedures in this case were reasonable under the totality of the circumstances. The judgment is **AFFIRMED.**

## I.  BACKGROUND

The nature of the investigation was developed in a district court evidentiary hearing.  On August 20, 2003, two Immigration and Customs Enforcement ("ICE") agents in Dallas, Texas received information from the ICE office in Boston, Massachusetts that approximately seven to nine undocumented Brazilian aliens were being harbored at a Dallas residence.  A computer search revealed that the residence was owned by Rafael Mendez, a Cuban national living in the United States under political asylum.  In the afternoon, the agents surveyed Mendez's residence.  Its barred windows, covered in dark drapes or blinds, a high security fence, and two large capacity vans parked in the driveway, all suggested that it could be used to harbor illegal aliens.

Three or four additional ICE agents arrived in unmarked vehicles sometime after 7 p.m.  They decided that undercover Agent Angel Rivera, posing as a civilian looking for his Brazilian relative, would knock on Mendez's door.  Children out on the street near the house foiled the plan by screaming at Rivera and calling him a "Narc".  Concerned for his safety, Agent Rivera retreated.

The ICE agents then settled on a joint "knock and talk" with two uniformed Dallas police officers.  None of the officers secured a warrant before approaching Mendez's house.  While the ICE agents wore plain clothes, all of the government officers carried

2

holstered sidearms. The agents and officers surrounded the house, and Agent Rivera walked to the side door, which appeared to be the main door. The door was wide open but the screen door was closed. Agent Rivera could see four people sitting at a table inside, including Mendez, whom Agent Rivera recognized from a photograph he had seen in Mendez's immigration records.

Agent Rivera knocked on the screen door, and, speaking in Spanish, asked Mendez to step outside. When Mendez did so, Agent Rivera identified himself, showed Mendez his credentials, and explained that he had information that there were illegal aliens inside the house. In response to the agent's question, Mendez denied that there were other people in the house besides those at the table. Mendez further stated that he "had no problem" consenting to Agent Rivera's "going inside and taking a look."

Agent Rivera testified that, upon entering the house, he saw, contrary to what Mendez had just told him, seven or eight people sitting on a couch watching television in the living room. The people did not appear to understand his questions in English or Spanish until he said the word "Brazil," provoking a nod from one of the individuals. Believing these individuals to be Brazilian illegal aliens, Agent Rivera called on his radio to the ICE agents and police officers outside, who then entered the house. The agents and officers performed what they considered a protective sweep, searching only for people, but not evidence, in each room. As part of this effort, the only agent present who knew Portuguese

3

spoke (although not fluently) to the suspected illegal aliens for approximately thirty to forty-five minutes, attempting to identify their immigration status.

Agent Rivera simultaneously returned outside, read Mendez his <u>Miranda</u> rights, and placed him under arrest. Agent Rivera then asked Mendez whether he would execute a written consent to search form. Mendez told Agent Rivera that he had little education and was unsure whether he had the authority to allow police to search his house, as it was in the process of being sold. Rivera assured him that he possessed proper authority to consent, and called for Mendez's wife. When she arrived, Rivera explained and read the consent form to both Mendez and his wife in their native Spanish. Mendez signed the form, and the agents began searching the house.

During their search, the agents seized date books, notepads and business cards, all which appeared to be related to an alien smuggling operation. When questioned about these items, Mendez told Agent Rivera that he ran a transport business and that he kept good records. Mendez's wife volunteered to retrieve the records and brought several documents outside to Agent Rivera. The agents also found business ledgers under Mendez's mattress that listed names, countries of origin, amounts of money, and destination of aliens.

After being given <u>Miranda</u> warnings again at the Dallas District immigration office, Mendez provided a voluntary three-page

4

statement detailing his involvement, since 2000, in the transportation of aliens within the United States.

On September 4, 2003, a federal grand jury charged Mendez with two counts of conspiracy and harboring illegal aliens. Mendez moved unsuccessfully to suppress all of the evidence seized and statements elicited as a result of the warrantless search of his house. He then pled guilty to count two of the indictment (harboring aliens in violation of 8 U.S.C. § 1324 (a)(1)(A)(iii)and (v)(II)) in exchange for the Government's dropping count one, but reserved his right to appeal the motion to suppress. He timely filed this appeal.

## II.  DISCUSSION

This Court reviews the district court's factual findings in connection with a suppression motion for clear error and its Fourth Amendment conclusions of law de novo. United States v. Brigham, 382 F.3d 500, 506 n.2 (5th Cir. 2004) (citations omitted). "The evidence is considered in the light most favorable to the prevailing party." Id.

Mendez argues that the district court erred in denying his motion to suppress evidence because: 1) the initial consent he gave Agent Rivera to search his house did not extend to the other agents present, who therefore entered his house without consent; 2) the agents had no basis to perform a protective sweep; and 3) his later written consent to enter and search his home was

5

ineffective because of the earlier violations.  We address each argument in turn.

## A.  Initial Consent

The district court found, over disputed testimony, that Mendez gave Agent Rivera consent to enter his house.  Mendez contends, however, that because his consent did not extend to the other agents present at the scene, the other agents' entrance into his house violated his Fourth Amendment rights.  The Government responds that Mendez's consent for one (Rivera) was effectively consent for all (six or seven other agents) on the facts of this case and in the absence of any limitation on his consent.

The district court did not rule on the scope of Mendez's consent, as the court approved the officers' entry into the house and detention of the Brazilians on a hybrid protective sweep/plain view rationale.  Nevertheless, the deficiency can be overlooked, because this purely legal issue was raised in the trial court and concerns undisputed facts.  See Ballard v. United States, 17 F.3d 116, 118 (5th Cir. 1994)(stating that reviewing court may affirm "on grounds other than those relied upon by the district court").  The Supreme Court holds that "[t]he standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness -- what would the typical reasonable person have understood by the exchange between the officer and the suspect?" Florida v. Jimeno, 500 U.S. 248, 251, 111 S. Ct. 1801,

6

1803-04 (1991). Although objective reasonableness is a question of law, "factual circumstances are highly relevant when determining what the reasonable person would have believed to be the outer bounds of the consent that was given." United States v. Mendoza-Gonzalez, 318 F.3d 663, 667 (5th Cir. 2003).

The facts preceding Agent Rivera's entry into the Mendez home have been recounted above. In particular, the ICE agent explained his objective – a search for illegal aliens – before entering the house. A reasonable person observing the exchange between Agent Rivera and Mendez would conclude that Mendez authorized a search of his house for people who might be illegal aliens, and that is exactly what transpired. On entry, Agent Rivera immediately noticed seven or eight people sitting in the living room. He ascertained that they did not respond to the English or Spanish languages except to acknowledge one word: "Brazil." Believing that the individuals in the living room were the illegal immigrants about whom he had earlier been informed, Agent Rivera called his fellow agents, who then entered to verify who was inside and to determine their alienage.

Although the agents characterized their action as a protective sweep, the actions they took to perform the sweep were within the scope of Mendez's original consent. The action the agents took, not the terminology they employed, is what is

constitutionally determinative.[1] The agents went from room to room to look for people and then interviewed the people they found to determine their immigration status. At no point during the thirty to forty-five minutes the agents were in the house did they search for physical evidence. The agents' actions were consistent with the scope of consent that Mendez gave to Agent Rivera.[2]

Mendez's argument that the initial consent he gave Agent Rivera to enter and search his home was specific to Agent Rivera, and was not meant to extend to the other agents present at the scene, is inconsistent with Mendez's actions during the search. It is the defendant's responsibility to limit the scope of the search if he so intends. United States v. McSween, 53 F.3d 684, 688 (5th Cir. 1995) (holding that the defendant's general consent to search his car gave the officer the authority to search under the hood because the defendant failed to limit the scope of the search). Accordingly, "a failure to object to the breadth of the search is properly considered an indication that the search was within the scope of the initial consent." Id. (internal quotations

---

[1] Whren v. United States, 517 U.S. 806, 813, 116 S.Ct. 1769, 1774 (1996) (stating that "the fact that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action").

[2] Mendez argues that the Government failed to argue below that the agents' entrance into the house and subsequent interrogation were allowed by Mendez's oral consent. The Government maintained in its trial court brief, however, that "[i]f the court finds Agent Rivera's testimony credible that the defendant voluntarily gave oral consent to enter the house to look for other people, then the protective sweep of the house was permissible."

and citations omitted).  In the instant case, Mendez made no attempt to limit the scope of his consent and never objected to the additional agents entering his house.  From this it can be inferred that the aid given Agent Rivera by the additional agents was within the scope of Mendez's consent.

Where the defendant has failed to limit the scope of the search, the question that remains in determining its validity is whether, under the totality of the circumstances, the search was reasonable.  See Jimeno, 500 U.S. at 250, 111 S. Ct. at 1803.  Mendez consented to have a government agent search his house for illegal aliens.  Under the totality of the circumstances, the entry of five or six additional agents into his house was not unreasonable.  When Agent Rivera stepped into Mendez's house, he immediately saw seven or eight people in the living room.  Three other individuals were sitting at the kitchen table.  Seriously outnumbered, and knowing that it was likely that several more people could be hidden in the additional rooms of the house, he decided to call in the additional agents.  It is eminently reasonable that several agents would be sent into the house to search for additional people and to determine the alienage of those present.  While there may well be an upper limit on the number of law enforcement officers who may search a private home under other circumstances, the limit of reasonableness was not reached in this case.

Mendez also asserts that, after Agent Rivera left the house and read him his <u>Miranda</u> rights, the consent to search was automatically withdrawn without his having to do or say anything to that effect. This court has never adopted a rule declaring that consent is automatically terminated upon arrest. Rather, consent is a fact-sensitive inquiry dependent on the totality of the circumstances. <u>United States v. Tompkins</u>, 130 F.3d 117, 121 (5th Cir. 1997) (citations omitted). We agree with the Seventh Circuit, which held that the fact that a person is "formally placed under arrest sometime after the first consent does not work as an automatic withdrawal of the consent previously given." <u>United States v. Mitchell</u>, 82 F.3d 146, 150-51 (7th Cir. 1996) (citations omitted); <u>see also</u> WAYNE R. LAFAVE, 4 SEARCH AND SEIZURE § 8.1(c) at 631 (4th ed.) ("[A] consent to search is not terminated merely by a worsening of the consenting party's position . . ." ).

We conclude that the government agents' initial search for aliens was eminently reasonable under the totality of the circumstances and that the agents acted within the scope of Mendez's consent. Nevertheless, we also agree that the search was valid under the essential rationale employed by the district court. We now turn to a brief analysis of both the protective sweep of Mendez's house and Mendez's later written consent to search.

## B. Protective Sweep

10

Mendez argues that there was no basis for the agents to perform a protective sweep. The protective sweep doctrine allows government agents, without a warrant, to conduct a quick and limited search of premises for the safety of the agents and others present at the scene. United States v. Gould, 364 F.3d 578, 581 (5th Cir. 2004)(en banc). A protective sweep of a house is legal if: (1) the government agents have a "legitimate law enforcement purpose" for being in the house; (2) the sweep is "supported by a reasonable, articulable suspicion that the area to be swept harbors an individual posing a danger to those on the scene;" (3) the sweep is "no more than a cursory inspection of those spaces where a person may be found;" and (4) the sweep "last[s] no longer than is necessary to dispel the reasonable suspicion of danger" and "last[s] no longer than the police are justified in remaining on the premises." Gould, 364 F.3d at 587 (internal quotations and citations omitted).

Mendez challenges the existence of all of the protective sweep elements. First, Mendez asserts that the agents were not permitted to make a protective sweep of his house because he was arrested outside. This position is contrary to Fifth Circuit authority. See, United States v. Watson, 273 F.3d 599, 603 (5th Cir. 2001). The agents were authorized to make a protective sweep even though Mendez was arrested outside, since they had reasonable grounds to believe there were people inside the house who posed a security risk.

11

Second, Mendez complains that the agents did not have reasonable, articulable suspicion that the house might harbor people who posed a danger to those on the scene. All of the facts that have been previously recited contradict this contention and demonstrate that the agents' suspicion of danger, whether ultimately correct or not, was completely reasonable. Immigration agents confront the crime of alien smuggling on a regular basis. The crime is inherently dangerous and often results in death and injury to both aliens and government agents.[3] The use of a protective sweep will often be, as it was here, a justifiable measure for the protection of law enforcement officers and the public in alien smuggling cases.

Finally, Mendez contends that the thirty to forty-five minute sweep embodied more than a cursory inspection of his house and was far longer than necessary to dispel any suspicion of danger. Although thirty to forty-five minutes is a long time to dispel a suspicion of danger, we are reluctant to say that the lengthy time taken in this case was unreasonable. There is a significant analytical difference between a protective sweep in the context of illegal alien smuggling and a protective sweep in other contexts. In this case, the agents had to take the time to determine the identity and alienage of the people they found in the

---

[3]   See Press Release, Department of Homeland Security, U.S. Launches Major Offensive Offensive Against Human Smuggling, *available at* http://usinfo.state.gov/gi/Archive/2003/Nov/11-897569.html.

house; otherwise, the agents could not distinguish between the suspects who might cause harm, and the victims of the alien smuggling scheme, whom the agents were responsible to protect. According to the record, the identification process was drawn out because of the language barrier with the Brazilians and the presence of only one agent who could speak some Portuguese. Significantly, the agents did not search for anything other than people, and no physical evidence was seized. Viewing the totality of the circumstances, including the limited and focused nature of the agents' conduct, the duration and scope of the protective sweep appear reasonable. However, because we have concluded that the agents' actions were reasonable and that they acted within the scope of Mendez's consent, it is unnecessary to rule definitively on whether, because of the duration of the sweep, the agents exceeded the bounds of a legitimate protective sweep.

The district court concluded that the extended duration of the agents' actions was inconsistent with a protective sweep, but it nevertheless found that the agents were entitled to remain in the house and question the suspected illegal aliens under the plain view doctrine. Although we do not conclude that the sweep was unreasonably prolonged, we endorse the application of the plain view doctrine. Even Mendez does not challenge the district court's application of the plain view doctrine to the Brazilian immigrants. In fact, Mendez states that "if this court finds that the agents' entry passes constitutional muster, under either a consensual

search or protective sweep doctrine, then it is clear that the agents could seize evidence in plain view." Reply Brief of Appellant at 14. We need not discuss the plain view doctrine further.

### C. Written Consent

Mendez contends that his later written consent to enter and search his home for physical evidence was both involuntary and ineffective due to the earlier alleged violations. Consensual searches are established exceptions to the Fourth Amendment's warrant requirement. Jimeno, 500 U.S. at 250, 111 S. Ct. at 1803. A person must freely and voluntarily consent, however, for the search to be valid. United States v. Tompkins, 130 F.3d 117, 121 (5th Cir. 1997) (citations omitted). In reviewing a district court's voluntariness finding, we will not overturn the court's decision unless it is clearly erroneous. United States v. Olivier-Becerril, 861 F.2d 424, 426 (5th Cir. 1988). Additionally, "[w]here the judge bases a finding of consent on the oral testimony at a suppression hearing, the clearly erroneous standard is particularly strong since the judge had the opportunity to observe the demeanor of the witnesses." United States v. Sutton, 850 F.2d 1083, 1086 (5th Cir.1988).

The voluntariness of consent depends upon the totality of the circumstances surrounding the search. Tompkins, 130 F.3d at 121 (citing Schneckloth v. Bustamonte, 412 U.S. 218, 227, 93 S. Ct.

14

2041, 2048 (1973)).  In examining the totality of the circum-
stances, we consider six factors:

> (1)  the voluntariness of the defendant's custodial
>      status;
> (2)  the presence of coercive police procedures;
> (3)  the extent and level of the defendant's cooperation
>      with the police;
> (4)  the defendant's awareness of his right to refuse to
>      consent;
> (5)  the defendant's education and intelligence; and
> (6)  the defendant's belief that no incriminating
>      evidence will be found.

Olivier-Becerril, 861 F.2d at 426 (citations omitted).  Although
all six factors are relevant, no single factor is dispositive or
controlling.  Id.

The district court found that the first and fifth factors
weighed against finding that Mendez's consent was voluntary,
because Mendez was in custody at the time he signed the consent
form, and Mendez did not know how to read and had limited
education.  The district court, however, determined that Mendez's
consent was voluntary because the remaining four factors weighed in
favor of voluntary consent.

We find no clear error in the district court's determina-
tions that there was no police coercion,[4] that Mendez cooperated

---

[4]      The district court determined that there was no police coercion
because:  (i) at no time did the government agents use any threats or draw their
weapons; (ii) Mendez was in the familiar surroundings of his own home; (iii) all
communications regarding the consent to search were in Mendez's native language,
Spanish; and (iv) the consent was fully read and explained to both him and his
wife before he signed.

15

with the police,[5] that Mendez was aware of his right to refuse consent,[6] and that Mendez probably believed that no incriminating evidence would be found.[7]  In short, the district court's finding of voluntary consent was not clearly erroneous.

## V.  CONCLUSION

For the reasons discussed above, we affirm the district court's denial of Mendez's motion to suppress and consequently **AFFIRM** the judgment of conviction.

---

[5]    The district court determined that Mendez cooperated with the police because he:  (i) voluntarily spoke with agent Rivera; (ii) orally consented to the search of his home; (iii) signed a written consent to search after being apprised of his <u>Miranda</u> rights as well as his right to demand a search warrant; and (iv) after waiving his <u>Miranda</u> rights, spoke to agents about his transporting business and handwrote a three-page statement detailing the business.

[6]    The district court found that Mendez was aware of his right to refuse consent because:  (i) he demonstrated that he understood Rivera's questions by providing responses to the questions in a timely manner; (ii) the agents provided him with written notice in his native language that he did not have to consent to the search of his home; and (iii) his rights were read and explained to his wife, who accompanied him during the signing.

[7]    The district court found that Mendez apparently believed that no incriminating evidence would be found because his business ledgers were hidden in his bed and his willful ignorance of his clients' immigration status would shield him.

16

EMILIO M. GARZA, Circuit Judge, concurring:

I concur in the judgment and opinion of the court with the exception of Part II, Section B concerning the protective sweep doctrine. The court need not reach the difficult issue of whether a protective sweep that lasts 35 to 45 minutes is reasonable because the agents' entry and search of the home was justified by Mendez's consent and Agent Rivera's observations that gave rise to probable cause. The majority cites no opinions holding that such an extended sweep is reasonable, and given that resolution of the issue is unnecessary, there is little reason to create new law in the area.

Mendez concedes that he consented to Agent Rivera's entry into his home. He also concedes that Agent Rivera had "credible evidence that Mendez was harboring Brazilians who were not legally in this country" and that he observed men in Mendez's home who spoke neither English nor Spanish but responded to the word "Brazil." These facts provided probable cause for Agent Rivera to arrest Mendez and justified his summoning of additional officers to assist in effecting that arrest. There is therefore no need to address whether the agents' actions fell within the protective sweep exception to the warrant requirement.