73 A.3d 385

**Kenneth REDMOND**

v.

**STATE of Maryland.**

No. 2281, Sept. Term, 2010.

Court of Special Appeals of Maryland.

Aug. 29, 2013.

**168**

Amanda D. Frizzelle (Paul B. DeWolfe, Public Defender, on the brief) Baltimore, MD, for appellant.

Jeremy M. McCoy (Douglas F. Gansler, Atty. Gen., on the brief) Baltimore, MD, for appellee.

Panel: EYLER, DEBORAH S., MEREDITH, JAMES A. KENNEY, III (Retired, Specially Assigned), JJ.

EYLER, DEBORAH S., J.

In the Circuit Court for Baltimore City, Kenneth Redmond, the appellant, was convicted by a jury of robbery with a deadly weapon, robbery, second-degree assault, and theft of less than $1,000. He was sentenced as a repeat offender to a term of 25 years without parole. He appeals, posing three questions for our review, which we have rephrased slightly:

I. Did the trial court err in denying his motion to suppress?

II. Did the trial court err by permitting the State to reopen its case-in-chief?

III. Did the trial court impose an illegal sentence?

For the reasons to follow, we answer the first question in the affirmative and shall reverse the judgments of the circuit court and remand the case for further proceedings. We need not reach the second and third questions.

### FACTS AND PROCEEDINGS[1]

On March 1, 2010, around 6:30 p.m., the victim, a high school junior, was on her way home from school in Baltimore City. As she was sitting at a bus stop at the corner of Franklin

---

1. Because our decision rests solely on the suppression motion question, the facts we recite are based on the evidence adduced at that hearing.

and Gilmor Streets talking on her cell phone, a man approached her from behind. He demanded: "Gimme all your stuff or I'll cut you." The victim turned around and saw a man holding a knife. He touched the victim's forearm with the knife and took her school bag, wallet, and cell phone and ran away.

The victim returned to her school, where she called 911. Officer Hassan Rodriguez from the Baltimore City Police Department ("BCPD") Western District responded to the school and transported the victim to the police station. Detective George Cannida interviewed her. She described her assailant as a black male with a salt and pepper beard, wearing gold rimless glasses, a skullcap, and a brown or black jacket. She also gave Detective Cannida her cell phone number and a description of the phone.

Officer Rodriguez faxed a copy of the police report to BCPD's Advanced Technology Team ("ATT"), a unit in the Criminal Investigations Division that specializes in locating stolen cell phones.

The next morning, March 2, 2010, detectives with the ATT obtained a wiretap warrant, contacted the victim's mobile service provider, learned that the cell phone remained active, and, by triangulating the signal from cell phone towers in the area, determined that the stolen cell phone was in the proximity of 3303 Round Road in Baltimore City's Cherry Hill neighborhood.

Later that day, at about 4:00 p.m., six ATT detectives, including Detective John Jendrek,[2] drove in two sport utility vehicles to the 3300 block of Round Road. They pulled up on the grass in front of 3305 Round Road. The officers walked to the door of 3305 Round Road and, using a ruse that we shall

---

*See, e.g., Sutton v. State,* 128 Md.App. 308, 313, 738 A.2d 286 (1999) (in reviewing denial of a motion to suppress appellate court looks to the facts adduced at the suppression hearing).

**2.** Detective Jendrek's name is spelled "Gendrix" in the transcript from the suppression hearing. We use the spelling in an ATT report introduced into evidence at the suppression hearing.

discuss *infra,* entered that house and spoke to the residents.[3] They did not locate the stolen cell phone or any other evidence.

Detective Jendrek then approached 3303 Round Road, a two-story brick house. The other five ATT detectives surrounded the house. Detective Jendrek knocked on the door. Devon Smith opened the door. Detective Jendrek identified himself as a police officer and, using the same ruse he had employed at 3305 Round Road, told Smith he was looking for a pedophile named "Leroy Smalls" who was wanted for child molestation. In fact, Leroy Smalls was "a completely ficti-tious person" invented by the detectives. Detective Jendrek showed Smith a photograph of a man who supposedly was "Leroy Smalls."[4] Smith looked at the picture and said, "Leroy doesn't live here."

Detective Jendrek then asked Smith if *he* lived at 3303 Round Road and whether he had identification. He also asked if anyone else lived in the house who could take a look at the photograph. According to Detective Jendrek, Smith replied, "Yeah, come on in."[5] Smith walked upstairs to get his ID. When he came back downstairs, Detective Jendrek and five other police officers (the ATT detectives) were inside his house.

Also inside the house was Smith's mother, Linda Jones, who lived there as well.[6] Jones was in the kitchen making dinner

---

**3.** The record does not reveal whether the ATT detectives searched the house at 3305 Round Road. Detective Jendrek could not remember whether the ATT detectives had approached any additional houses on the 3300 block of Round Road.

**4.** Detective Jendrek testified that he did not know the identity of the person in the photograph.

**5.** Smith testified that he was outside the house when Detective Jendrek and the other five ATT detectives approached him and showed him the "Leroy Smalls" picture.

**6.** Smith's brother Kevin Sanford also lived at 3303 Round Road, but he was not home at the time. Smith and Sanford both are adults; Smith was 39 years old in March of 2010.

when she saw the police officers inside her house.[7] Some of them were walking upstairs. Jones asked what was going on. A detective replied that they were looking for a pedophile. He showed her the photograph of "Leroy Smalls" and asked if she had seen him. She responded that she had not seen the man pictured.

In the meantime, once inside the house, an ATT detective surreptitiously dialed the victim's cell phone number. Immediately thereafter, Detective Jendrek heard a cell phone ringing inside the house. The ringing sound was coming from the second floor. Jones told Detective Jendrek that the cell phone that was ringing had been given to her by her "boyfriend." [8] Detective Jendrek and other ATT detectives went upstairs and observed a ringing cell phone on a dresser in a front bedroom. Detective Jendrek did not touch the cell phone.

Without saying anything more to Smith or Jones, Detective Jendrek and another ATT detective proceeded to conduct a "protective sweep" of the house to "make sure there [were] no other persons" inside. The two officers walked through the entire house, opening closet doors and checking under beds. Smith followed behind them. He "assume[d] they [were] looking for this pedo[ph]ile."

The ATT detectives ordered Smith and Jones to go to the living room of the house and stay there. It was only then that Smith and Jones learned that the police were not in their house to look for a pedophile, but to investigate them. Detective Jendrek contacted Sergeant Santos,[9] at the Western

---

**7.** Detective Jendrek testified that he believed Jones may have been upstairs when the ATT arrived at the house. He was unsure about this, however. Both Jones and Smith testified that Jones was in the kitchen on the first floor when the ATT detectives entered the house.

**8.** Detective Jendrek could not recall any details of his conversation with Jones except her statement that the ringing cell phone had been given to her by her boyfriend. It is not clear whether she volunteered this information or whether it was offered in response to a question from one of the ATT detectives.

**9.** The record does not reveal Sergeant Santos's first name.

District, and told him that the stolen cell phone had been located inside 3303 Round Road. Sergeant Santos conveyed this information to Detective Cannida.

Detective Cannida prepared a search warrant application. In it, he averred that he had probable cause to believe that the items stolen from the victim, including her cell phone, and the knife used in the robbery were concealed inside 3303 Round Road. He further averred that,

> On March 2, 2010 at approximately 4:00 pm, members of the [ATT] utilized sophisticated mobile and/or portable surveillance equipment to locate the ... cellular telephone taken from the victim. The aforementioned equipment indicated that the target phone was in the house located at 3303 Round Road.... Members of the [ATT] entered the location with the permission of the owners of the dwelling. Once inside the dwelling [Smith and Jones] [were] found to be the only individuals inside the dwelling.

> The target phone was located at this address by Det. Jend[rek] using cellular site location data and received signal strength from the specific cellular telephone; advanced electronic directional finding equipment was able to pinpoint the precise location of the aforementioned handset.

In the meantime, Smith and Jones continued to be detained in their living room, first by the ATT detectives and later by two uniformed officers from the Western District. Smith was handcuffed for much of this time.[10] While Smith and Jones were being held in the living room, the appellant, who was Jones's boyfriend and was living in the house as well, came home, using his key to let himself in through the back door. He stayed in the living room with Smith and Jones.

The search warrant was executed around 8:35 p.m., four and one-half hours after the ATT detectives located the stolen cell phone. The officers seized numerous items, including the

---

10. Smith testified that he was handcuffed because the uniformed officers both were women, "[s]o, [he] had to be handcuffed."

stolen cell phone and two knives.[11] The cell phone was recovered from Jones's bedroom.

Smith, Jones, and the appellant all were advised of their *Miranda* rights and were interviewed by the police. Jones told the police that the appellant had given her the cell phone the day before, after she got off work.

On March 3, 2010, the appellant was arrested and charged.

On May 6, 2010, the appellant moved to suppress the evidence seized from 3303 Round Road on the basis that the police had conducted a warrantless search of his house and that none of the exceptions to the warrant requirement were applicable. A hearing on his motion was held on August 30, 2010. The State called Detective Jendrek as its sole witness. The appellant called Detective Cannida, Smith, and Jones.

The State argued that the ATT had been able to determine that the stolen cell phone was "in the area [of] 3[3]03 Round Road," but could "not be positive that the phone was [in that particular house] until they actually entered 3303." So, to determine whether the stolen cell phone was inside 3303 Round Road, they used the pedophile ruse to gain consent to enter the house and, once inside, dialed the number for the stolen cell phone. After hearing the phone ring, the ATT confirmed that the stolen cell phone was inside 3303 Round Road and conducted a protective sweep for officer safety. The full blown search of the house and the seizure of the cell phone happened only after the warrant had been secured.

Defense counsel argued that Smith's and Jones's testimony made plain that neither had consented to a warrantless entry into 3303 Round Road by the ATT detectives. Moreover, he maintained that the ruse employed by Detective Jendrek rendered any consent given coerced and therefore not voluntary. Defense counsel further asserted that, because the ATT knew that the cell phone was located inside either 3303 or

---

11. Both Smith and Jones testified that ATT detectives seized the stolen cell phone when they first located it. As mentioned, Detective Jendrek's testimony was to the contrary.

3305 Round Road based on the triangulation data, the warrantless entry was particularly egregious as the police could have and should have sought a search warrant before making any entry into the house. Because the police chose to enter the house without a warrant and without valid consent, all of the evidence seized and the witness statements obtained were inadmissible as fruits of the poisonous tree.

The court denied the motion to suppress. It found as a fact that, using "phone company technology," the ATT determined that the stolen cell phone was located inside either 3303 or 3305 Round Road; Detective Jendrek then "eliminated" the possibility that the cell phone was inside 3305 Round Road based upon "the response that he got from the occupant there"; and Detective Jendrek chose to "confirm the electronic information by the use of a ruse at 3303 [Round Road]." The court further found that Detective Jendrek knocked on the door and, when Smith answered, showed him a photograph supposedly depicting a pedophile. Smith said he did not know the man pictured. Detective Jendrek asked Smith for ID, "ostensibly to make sure that [Smith] wasn't [Leroy] Smalls," and Smith went upstairs to get his ID. The court found that the police entered the house at that point in time. Notwithstanding Detective Jendrek's testimony, the court did not make any finding as to whether Smith expressly consented to the police entering. Once inside the house, the police found Jones inside cooking and used the same pedophile ruse on her. In the meantime, an ATT detective dialed the number of the stolen cell phone and heard it ringing. The court found that neither Smith nor Jones was concerned with the police being inside their home until such time as they were ordered by the police to stay in their living room.

The court concluded that "the consent exception to the warrant requirement appli[ed]," but, even if there only was "mere acquiescence," and not actual consent, the police lawfully "impound[ed] ... the house ... [based upon] exigent circumstances" until they were able to obtain a search warrant. Specifically, the court found that the police were trying to locate a "dangerous armed robber on the loose"; that "the

only way to find him [was] through a cell phone": and that the risk that the stolen cell phone might be destroyed or removed from the house before a warrant was secured justified the "narrowly tailored intrusion into Fourth Amendment privacy of the three people in the home." The court further concluded that, even if the contested averment that the ATT detectives entered the house with "permission of the owners" was excised from the warrant application, the warrant was supported by probable cause and therefore the evidence seized pursuant to the warrant need not be excluded.

The appellant was tried by a jury on September 1 and 2, 2010. He was convicted of all charges except wearing and carrying a dangerous weapon. As mentioned, he was sentenced to a term of 25 years without the possibility of parole.

This timely appeal followed. We shall include additional facts in our discussion of the issues.

## DISCUSSION

### I.

### Denial of Motion to Suppress

The appellant contends the circuit court erred in denying his motion to suppress because the State failed to present evidence to overcome the presumption that a warrantless entry into a home is *per se* unreasonable. He maintains that, even crediting the testimony of Detective Jendrek that Smith told the ATT detectives to "come on in," the evidence did not support a finding that consent to enter was "freely and voluntarily given." He argues further that, even if Smith validly consented to the police entering 3303 Round Road while he went upstairs to get his ID, the police exceeded the scope of that consent. The consent encompassed only a search for the fictitious "Leroy Smalls." The police exceeded that scope by dialing the number of the stolen cell phone and by conducting the "protective sweep." Finally, the appellant maintains that the search warrant eventually obtained by the police did not remove the taint of the initial illegal entry

because it was based upon information obtained by the police during that entry.

The State responds that the circuit court found that Smith voluntarily consented to the police entering the house he shared with his mother, brother, and the appellant and that finding was not clearly erroneous and was legally correct. It argues that Detective Jendrek's testimony that Smith told him to "come on in," coupled with Smith's and Jones's testimony that they never asked the police to leave, amply supports the court's finding on this point. Relying on *Brown v. State*, 378 Md. 355, 835 A.2d 1208 (2003), the State asserts, moreover, that the use of a ruse by the police to obtain consent to enter a person's house does not vitiate the voluntariness of the consent given. Finally, the State maintains that, in any event, the search warrant ultimately obtained by the police was supported by probable cause independent of any constitutionally tainted averments.

In reviewing the circuit court's ruling on the motion to suppress, "[w]e extend great deference to the fact finding of the suppression court and accept the facts as found by that court unless clearly erroneous." *Nathan v. State*, 370 Md. 648, 659, 805 A.2d 1086 (2002) (quoting *Wilkes v. State*, 364 Md. 554, 569, 774 A.2d 420 (2001)). We consider the evidence introduced at the suppression hearing and the reasonable inferences drawn therefrom that are most favorable to the prevailing party on the motion. *State v. Ofori*, 170 Md.App. 211, 218, 906 A.2d 1089 (2006). Nevertheless, we review the ultimate question of constitutionality *de novo* and must "make our own independent constitutional appraisal by reviewing the law and applying it to the facts of the case." *Bailey v. State*, 412 Md. 349, 362, 987 A.2d 72 (2010) (citations omitted).

 The Fourth Amendment to the United States Constitution, made applicable to the states by the Fourteenth Amendment,[12] prohibits "unreasonable searches and seizures."

---

12. *Mapp v. Ohio*, 367 U.S. 643, 655, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961).

"[P]hysical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *United States v. United States Dist. Court*, 407 U.S. 297, 313, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972). Thus, "searches and seizures inside a home without a warrant are presumptively unreasonable." *Payton v. New York*, 445 U.S. 573, 586, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). "Nevertheless, because the ultimate touchstone of the Fourth Amendment is 'reasonableness,' the warrant requirement is subject to certain exceptions." *Brigham City v. Stuart*, 547 U.S. 398, 403, 126 S.Ct. 1943, 164 L.Ed.2d 650 (2006). "Such reasonableness exceptions, however, must be narrow and well-delineated in order to retain their constitutional character." *United States v. Yengel*, 711 F.3d 392, 396 (4th Cir.2013).

 "A search conducted pursuant to valid consent, *i.e.*, voluntary and with actual or apparent authority to do so, is a recognized exception to the warrant requirement." *Jones v. State*, 407 Md. 33, 51, 962 A.2d 393 (2008). The voluntariness, *vel non*, of a consent is a question of fact determined under the totality of the circumstances based upon standards set forth in *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). *See also Scott v. State*, 366 Md. 121, 140–42, 782 A.2d 862 (2001) (discussing the *Schneckloth* analysis). The *Schneckloth* Court held that to meet its burden of proving valid consent, thus overcoming the presumption of unreasonableness, the government must show "that the consent was in fact voluntarily given, and not the result of duress or coercion, express or implied." 412 U.S. at 248, 93 S.Ct. 2041. The "knowledge of a right to refuse is a factor to be taken into account," but the lack of such knowledge does not make any consent given *per se* involuntary. *Id.* at 249, 93 S.Ct. 2041.

 Ordinarily, evidence obtained in violation of the Fourth Amendment is not admissible, under the exclusionary rule. *Cox v. State*, 194 Md.App. 629, 653, 5 A.3d 730 (2010), *aff'd*, 421 Md. 630, 28 A.3d 687 (2011). This " 'judicially imposed sanction' . . . serves to 'deter lawless and unwarrant-

ed searches and seizures by law enforcement officers.' " *Id.* (quoting *Myers v. State,* 395 Md. 261, 282, 909 A.2d 1048 (2006)).

## A. *Voluntariness and Scope of Consent*

■ In the case at bar, we first must undertake an independent constitutional appraisal of whether, under the totality of the circumstances, the police obtained valid consent to enter 3303 Round Road and, if so, whether the police exceeded the scope of the consent given by dialing the number of the stolen cell phone and conducting a protective sweep. In making this assessment, we must be cognizant of what the circuit court did and *did not* find. The court found that the police obtained consent to enter 3303 Round Road by way of a ruse; specifically, they misrepresented to Smith, and later to Jones, that they were looking for a pedophile named "Leroy Smalls," going so far as to display a photograph of the supposed suspect. In fact, there was no such wanted pedophile, and no "Leroy Smalls." The real purpose the police had for entering 3303 Round Road was to search for the stolen cell phone they believed to be inside that house.

The court found that neither Smith nor Jones affirmatively told the police not to enter the house and, once the police were inside, neither Smith nor Jones asked them to leave. The court did not find, however, that Smith or Jones agreed to allow the police to "look around" or search the house. At most, the court found that Smith consented to Detective Jendrek's entering the house to speak to Smith's mother (Jones) about the supposedly wanted pedophile and to wait for Smith to get his ID, which the court found was "ostensibly to prove he was not [Leroy Smalls]." [13] The court also did not find that the police told Smith or Jones that they did not have to agree to the police entering. Jones did not know the police

---

13. Of course, even if "Leroy Smalls" were not a fictitious person, the police did not need to see Smith's identification to determine that Smith was not "Leroy Smalls," given that they had in their possession a photograph of "Smalls" and there is nothing in the record to suggest that Smith bore any resemblance to the man pictured.

were entering her house until they already were inside. Finally, the court did not find that the police asked Smith or Jones for permission to go upstairs in the house for any reason, including to look around.

Two Maryland appellate court decisions have addressed the use of a ruse by law enforcement agents to obtain consent to enter a dwelling: *Perkins v. State*, 83 Md.App. 341, 574 A.2d 356 (1990), and *Brown v. State, supra.* In *Perkins,* the defendant was staying in a motel room. The motel desk clerk called the police and told them she had rented a room to the defendant and she thought he was wanted by the police because a few days earlier some police officers had been asking about him. The police responded to the motel. Although they found no active warrants for the defendant, they decided to go to his motel room anyway in an attempt to "verify his identity." *Id.* at 347, 574 A.2d 356.

One officer knocked on the defendant's motel room door. A male voice asked, "Who is it?" *Id.* at 348, 574 A.2d 356. The officer replied, "Howard County Police, open the door." *Id.* The defendant opened the door. The officer told the defendant that the police were investigating a noise complaint and asked if he (the officer) could "come in and talk to [the defendant]." *Id.* at 349, 574 A.2d 356. According to the officer, the defendant replied, "sure, come on in." *Id.* In fact, there was no noise complaint.

The appellant had three guests in his motel room. Two officers entered the room. Upon doing so, they demanded that the defendant and his guests produce identification. The officers stood over the defendant while he searched through his bag for his ID, and by doing so were able to observe razor blades in the bag. The officers then looked around the room and saw a "blow torch" and a "small glass object" in "plain view." *Id.* at 351, 574 A.2d 356. They entered the bathroom, looked around, and saw a bag of cocaine floating in the toilet. *Id.* at 352, 574 A.2d 356.

The police seized the blow torch, the small glass object, the razor blades, and the bag of cocaine. The defendant was

charged with possession with intent to distribute cocaine and possession of paraphernalia. Before trial, he moved to suppress the evidence seized from his motel room. The circuit court denied the motion, and the defendant was convicted of the crimes charged.

On appeal, the defendant argued that the police had violated his Fourth Amendment rights by entering his motel room and searching it. We concluded, initially, that the officer's statement to the defendant to "open the door" was a command, not a request, and therefore the defendant's opening of the door was not consensual. We further concluded with respect to whether there was a valid consent for the police to enter the motel room that the affirmative misstatement by the officer about his purpose—to speak to the defendant about a noise complaint—"call[ed] into question the knowing and voluntary quality of the consent." *Id.* at 349, 574 A.2d 356. Moreover, we reasoned that, even if the defendant voluntarily consented to the police entering the motel room, the scope of the permission given was coextensive with the reason given by the police, *i.e.,* "for the limited purpose of talking about noise." *Id.* at 351, 574 A.2d 356. The conduct by the police strayed beyond the scope of that consent. Accordingly, we held that the circuit court erred in denying the suppression motion.

By contrast, in *Brown v. State,* 378 Md. 355, 835 A.2d 1208, the Court of Appeals affirmed the denial of a motion to suppress evidence seized from a motel room after the police obtained consent to enter by means of a ruse. There, a Maryland State Trooper received an anonymous tip about possible drug activity in a motel room. In reliance on that tip, which the State acknowledged was not sufficient to establish probable cause to search the motel room, the trooper and two other police officers went to the motel room and knocked on the door. The defendant, one of two occupants of the room, asked who was there. The trooper replied, "maintenance" and asked to come in to check the thermostat. *Id.* at 359, 835 A.2d 1208. The defendant opened the door. Still standing outside the motel room, the trooper identified himself as a police officer, displayed his badge, and asked if he could come inside

and "talk with [the defendant]." *Id.* The defendant agreed and stepped back to allow the trooper and one of the other officers to enter. As soon as he walked into the motel room, the trooper smelled the odor of burning marijuana and saw a "burnt marijuana cigarette" in an ashtray. *Id.* The defendant grabbed the marijuana cigarette, putting it in his mouth "as if to swallow it." *Id.* The trooper told the defendant that he (the trooper) already had seen the marijuana cigarette. The defendant removed the marijuana cigarette from his mouth, placing it back in the ashtray. The trooper asked the defendant whether he had rented the room. The defendant replied that he had. The trooper then asked if he could search the room and the defendant responded that he could. In the search, the trooper found a digital scale with trace amounts of cocaine on it, a cache of cocaine, and $926 in cash. The defendant and the other occupant of the room were arrested and charged with drug offenses.

The defendant moved to suppress the evidence found in the motel room. He acknowledged at the suppression hearing that the trooper had identified himself as a police officer and had asked for permission to enter the motel room just to talk. He "expressed the belief that he had no right to prevent the officers from entering, so, to avoid a confrontation, he backed away from the door." *Id.* at 360, 835 A.2d 1208. The trooper testified that the defendant expressly consented both to the police entering the motel room and to their searching it. Finding the trooper's testimony more credible than that of the defendant, the court denied the motion to suppress.

On appeal after conviction, in reliance on *Perkins,* the defendant argued that the "deception employed by [the trooper] . . . induced him to open the door, and, . . . 'erode[d] the consensual quality of that opening.'" *Id.* (quoting *Perkins,* 83 Md.App. at 350, 574 A.2d 356). The Court of Appeals disagreed. It emphasized that the United States Supreme Court consistently has held that police use of deception "to obtain entry into Fourth Amendment-protected areas for the purpose of observation does not necessarily contravene any Fourth Amendment rights," citing cases in which police officers mis-

represented their identities for investigative purposes, such as to carry out controlled purchases of drugs. *Id.* at 362, 574 A.2d 356. The Court explained that, in light of these decisions, state and federal courts have declined to suppress evidence "seen in plain view or discovered pursuant to a consensual search after officers gained entry into motel rooms or other residential areas by various modes of deception—pretending to be persons other than police officers or concealing their purpose." *Id.* at 363, 574 A.2d 356.

The *Brown* Court distinguished *Perkins*, explaining:

[W]e think the Court of Special Appeals was correct in *Perkins* in noting that, ***when deception or ruse directly induces consent for the police to enter an area in which the defendant has a reasonable expectation of privacy, the "quality" of that consent may be regarded as "eroded"—not necessarily destroyed or eliminated, but eroded.*** That is not an issue here, however. The principal, and decisive, distinction between this case and *Perkins* lies in the fact that the deception practiced by [the trooper] in this case—representing himself as a maintenance person desirous of checking the thermostat—induced nothing more than the opening of the door. [The defendant] concededly knew before he allowed [the trooper] and his colleagues to enter that they were police officers. [The trooper] asked for permission to enter and talk; after having identified himself prior to entry, he never misrepresented his purpose for requesting permission to enter. The entry that led to the observation in plain view of the marijuana cigarette and, upon appellant's ensuing consent, discovery of the scale, the cocaine, and the cash was not induced by deception, either as to [the trooper]'s identity or purpose. The earlier deception that induced appellant to open the door had no erosive effect on the consent to enter or the consent to search.

*Id.* at 365, 574 A.2d 356 (emphasis added).

Returning to the instant case, we conclude, under the holdings in *Brown* and *Perkins,* that the "quality" of Smith's consent to Detective Jendrek's entering the house and to

Jones's implied consent to allow the officers to remain in the house, were eroded and were "directly induce[d]" by an affirmative misrepresentation by the police as to their purpose for entering the house and for remaining there. *Id.* at 365, 574 A.2d 356.

The circumstances here are unlike those in *Brown,* where the police used a "maintenance" ruse to trick the defendant into opening his motel room door, but from that point on were truthful about who they were (the police) and why they wanted to enter the motel room (to talk to the defendant). In the case at bar, the ruse that the police were trying to find a fictitious pedophile was used throughout. It was used to get Smith to open the door; to get Smith to allow the police to enter the house; and to explain to Jones, who had not consented to the entry and asked the police what they were doing in her house, why they were there. The other ATT detectives who entered the house along with Detective Jendrek used the time in which Jones was being shown the photograph of "Leroy Smalls" and being asked whether she knew anything about the supposed pedophile to call the number of the stolen cell phone, a means of searching for its presence in the house, which was the true and only purpose for the police entering the house. At no time did the police reveal that they were *not* inside the house to further their search for a pedophile and at no time did they reveal their actual purpose in entering the house. The ruse continued. Even after the ATT detective's call resulted in the stolen cell phone ringing upstairs, the police did not reveal their purpose in being inside the house. Only when Smith and Jones were detained in their living room under police guard, and with Smith in handcuffs, were they advised that the police actually were investigating a robbery involving a stolen cell phone and that they were the targets of the investigation.

This case not only is unlike *Brown,* its facts are more extreme than those in *Perkins,* where the police used a fake noise complaint to gain entry into the defendant's motel room. At least the ruse in *Perkins* involved alleged misconduct on the defendant's part. Here the ruse was designed to make

Smith and Jones think they were helping the police investigate the whereabouts of a dangerous pedophile.

Courts in other jurisdictions have held that an " 'extreme' misrepresentation of investigatory purpose [may have the effect of] depriv[ing the individual of] the ability to make a fair assessment of the need to surrender his privacy.' " *United States v. Montes–Reyes,* 547 F.Supp.2d 281, 291 (S.D.N.Y. 2008) (quoting 2 Wayne R. LaFave, *et al., Criminal Procedure* § 3.10(c) (3d ed.2007)); *Hoffa v. United States,* 385 U.S. 293, 301, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966) ("The Fourth Amendment can certainly be violated by guileful as well as by forcible intrusions into a constitutionally protected area."). *See also United States v. Harrison,* 639 F.3d 1273, 1280–81 (10th Cir.2011) (affirming lower court's determination that consent to enter was not voluntarily given when police misrepresented to the defendant that they were investigating an anonymous tip that there might be a bomb in his home); *United States v. Hardin,* 539 F.3d 404, 424–25 (6th Cir.2008) (consent involuntary when the apartment manager, as an agent of the police, confirmed the defendant's presence in his apartment by misrepresenting to another occupant that he needed to come in to check for a water leak); *United States v. Giraldo,* 743 F.Supp. 152, 153–54 (E.D.N.Y.1990) (consent not freely and voluntarily given when police told suspect they needed to come inside his house to check for a gas leak); *Krause v. Commonwealth,* 206 S.W.3d 922, 925–26 (Ky.2006) (consent coerced when police told suspect in drug investigation that they were investigating a rape of a young girl that allegedly occurred at the suspect's house and needed to come inside to determine if the rape victim's description of the house matched the suspect's house); *People v. Jefferson,* 43 A.D.2d 112, 350 N.Y.S.2d 3 (1973) (consent involuntary when police claimed to be investigating a gas leak).

In *Montes–Reyes,* agents with a Drug Enforcement Agency ("DEA") task force had been surveilling the defendant, who was staying in a hotel room. A DEA agent knocked on the defendant's hotel room door, intentionally misidentified himself as a New York City police officer, displayed an NYPD

badge, and told the defendant he was searching for a missing girl. The DEA agent showed the defendant a flier from the National Center for Missing and Exploited Children depicting a young girl and her would-be abductor, a middle-aged woman.[14] The DEA agent asked the defendant for permission to enter his hotel room to check for the missing girl. The defendant consented. Within a few seconds, four DEA agents and one investigator entered the hotel room as well. Within a few minutes more, the DEA agent obtained the defendant's oral and written consent to search the room for guns. A search of a black bag revealed heroin. Upon being charged,[15] the defendant moved to suppress that evidence.

After conducting a comprehensive review of the case law relating to consent searches resulting from police ruses, the district court granted the motion to suppress. The court categorized as follows the cases in which consent to enter an abode was obtained by means of police deception: 1) "cases in which the person whose consent is sought is left with the impression that his consent cannot be lawfully withheld," *id.* at 287; 2) cases in which the police seek consent based on "certain dire or otherwise exigent circumstances," *id.* at 288; and 3) cases in which undercover police officers misrepresent their identity and obtain consent to enter a home. *Id.* In the first two categories, courts have deemed any consent given to be involuntary. In the third category, courts have required that undercover agents not exceed the objectively reasonable scope of the consent given. The district court reasoned that the proposition underlying these cases is that deception does not necessarily vitiate the voluntariness of consent, but that the nature of the deception is highly relevant to a totality of the circumstances analysis of voluntariness. *Id.* at 290. The district court concluded that the "missing girl" ruse fell into

---

**14.** The flier was genuine and the girl pictured had in fact been abducted. The DEA agent was investigating the defendant for suspected drug activity, however, not in an effort to find the missing child.

**15.** The precise charges against the defendant are not set forth in the opinion.

the second category of cases because it "created a false sense of exigent circumstances" and was so extreme as to render any consent given coerced and therefore involuntary. *Id.* at 291.

In the case at bar, we conclude that, as in *Montes–Reyes,* the police misrepresentation of purpose was extreme. Public outrage over the sexual abuse of children is widespread. The ruse concocted by the police was designed to exploit that outrage. As observed, the occupants of 3303 Round Road were led to believe that neither they nor anyone in their household was under suspicion but that the police needed their help to locate a dangerous pedophile. The ruse was detailed to give it validity, with the name and a photograph of the fictitious pedophile being given to Smith and Jones to make the (false) purpose of the police entry and presence in their home credible. Jones allowed police to remain in the house for that purpose. We are persuaded by the reasoning of the *Montes–Reyes* court that consent given under these extreme circumstances is not freely made. It is based on intentionally false information that is likely to result in the recipient's allowing entry so the police can fulfill a dire public safety purpose the recipient has been misled into thinking the police have, when they do not. *See Krause, supra,* 206 S.W.3d at 925 (explaining that the police were "only able to reach a location [where they could observe illegal contraband in plain view] through machination").

Even if the consent given by Smith to enter the house were voluntary, we nevertheless would reverse the denial of the motion to suppress on the ground that the police exceeded the scope of the consent that was given. "The standard for measuring the scope of a [person]'s consent under the Fourth Amendment is that of 'objective' reasonableness—what would the typical reasonable person have understood by the exchange between the officer and [the person giving consent]?" *Florida v. Jimeno,* 500 U.S. 248, 251, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991). The objective reasonableness determination is a question of law, but "factual circum-

stances are highly relevant when determining what the reasonable person would have believed to be the outer bounds of the consent that was given." *United States v. Mendoza–Gonzalez*, 318 F.3d 663, 667 (5th Cir.2003).

 "The scope of a search is generally defined by its expressed object." *Jimeno*, 500 U.S. at 251, 111 S.Ct. 1801. For example, in *United States v. Mendez*, 431 F.3d 420 (5th Cir.2005), agents with the Immigration and Customs Enforcement agency ("ICE") were investigating whether a Dallas homeowner was harboring undocumented immigrants in his home. An ICE agent approached the home to conduct a "knock and talk" with the homeowner.[16] Speaking in Spanish, the agent asked the homeowner to step outside, identified himself as an ICE agent, and "explained that he had information that there were illegal aliens inside the house." *Id.* at 424. In response, the homeowner denied that there were any other people in the house beyond three people visible through the door and told the agent he had " 'no problem' consenting to [the agent]'s 'going inside and taking a look.' " *Id.* Upon entering the home, the agent encountered seven or eight non-English speaking people sitting on a couch watching television. The agent radioed for backup and six or seven additional ICE agents and two uniformed local police officers entered the home to conduct a "protective sweep" for more undocumented immigrants. *Id.* at 425. The homeowner later consented to a full search and police seized physical evidence that the homeowner was running an immigrant smuggling operation. Ultimately, the homeowner was charged with two counts of conspiracy to harbor undocumented immigrants. He moved to suppress evidence seized and statements elicited as a result of the warrantless search of his home. His motion was denied.

---

**16.** A "knock and talk" is a police investigatory technique where police "approach [a] dwelling, knock on the door, identify themselves as law enforcement officers, request entry in order to ask questions concerning unlawful activity in the area, and, upon entry, eventually ask permission to search the premises." *Scott, supra,* 366 Md. at 129, 782 A.2d 862.

On appeal following his guilty plea, the Fifth Circuit held that the homeowner's initial consent to the agent's entering to "look around" encompassed "a search of his house for people who might be illegal aliens, and that [was] exactly what transpired." *Id.* at 426. After the first ICE agent found a group of people he believed to be undocumented immigrants, he asked his fellow agents to enter the home to help him search the remainder of the home for more people. The court held that the "agents' actions were consistent with the scope of consent that [the homeowner] gave to [the first ICE agent]." *Id.* at 426–27.

As the *Perkins* Court discussed, however, when the police use a ruse to gain entry to an abode, the nature of the ruse informs the analysis of whether the police exceeded the scope of the consent that was given. There, we explained that, because the police had obtained consent to enter the defendant's hotel room only for the purpose of "talking" to him about a noise complaint (which was made up), the scope of the consent did not extend to production of identification or to a visual inspection of the hotel room and bathroom. *See also United States v. Parson*, 599 F.Supp.2d 592, 609–10 (W.D.Pa. 2009) (when police obtained consent to enter defendant's trailer by using a ruse that they were investigating potential identity theft by others, they exceeded the scope of the consent by searching defendant's computer for child pornography); *but see State v. Nedergard*, 51 Wash.App. 304, 753 P.2d 526, 529 (1988) (when defendant consented to police, masquerading as potential homebuyers, "look[ing] around," police did not exceed the scope of the consent by searching basement of home).

In the instant case, crediting Detective Jendrek's testimony that Smith expressly consented to the police entering the house,[17] the consent was for the limited purposes of having the officers show Jones the photograph to determine if she recog-

---

17. The trial court noted that Smith denied having expressly consented to the police entry, but, as mentioned above, did not resolve this dispute of fact.

nized the "pedophile" and confirming Smith's identity. Of course, as Detective Jendrek acknowledged, the real purpose for the ATT detectives entering 3303 Round Road was to "further the ATT's investigation" into the location of the stolen cell phone by dialing the number of that phone to see if it was in the house. Without any further permission, or disclosing the actual purpose for the police presence, an ATT detective dialed the number and, when a cell phone inside the house rang, Detective Jendrek walked upstairs and saw the ringing phone on the dresser in a front bedroom.

The State attempts to draw an analogy to the plain view doctrine, arguing that, after the police entered the house and dialed the number for the stolen cell phone, the "ringing of the cell phone inside the house constituted evidence of criminal activity perceived through the senses of officers who were lawfully present inside of the residence." The circumstances simply are not analogous. Here, the police did not enter the premises for the supposed purpose of ferreting out a child molester and, merely by entering, saw, heard, or smelled evidence of criminality. Rather, upon gaining entry to the house they took an affirmative step to find contraband (the stolen cell phone) they thought was present in the house by dialing the phone's number. It was the affirmative police action—the dialing of the phone—that resulted in the ringing. Moreover, according to Detective Jendrek, when the police heard the phone ringing, they went upstairs and observed it. Plainly, the police exceeded the scope of any consent given to enter 3303 Round Road to make inquiries about a supposed pedophile in the neighborhood when, upon entering, they initiated a search for the stolen cell phone by calling its number, and then went upstairs to locate it. Nothing in this situation bears any resemblance to discovery of contraband in plain view.

For all these reasons, the initial subterfuge by the ATT detectives vitiated the voluntariness of any consent Smith gave for the police to enter the house at 3303 Round Road or that Jones impliedly gave to their remaining there. And, even

if the consent to enter and remain had been voluntary, the police exceeded the scope of that consent when they acted beyond the purpose given that produced the consent.[18] By dialing the number of the stolen cell phone and walking upstairs to locate it, the police exceeded the scope of any consent that was given to their presence inside 3303 Round Road.

## B. *Exclusionary Rule*

Our conclusion that the warrantless police entry into 3303 Round Road was unlawful is not the end of our inquiry. The State contends and the circuit court concluded that, even if the initial entry was illegal, the police later obtained a

---

**18.** As mentioned, the suppression court relied upon exigency as an alternative basis for its decision to deny the motion to suppress. The State does not argue before this Court that exigent circumstances justified the warrantless entry of the police into 3303 Round Road. (The State did not argue exigency below, either.) This is not surprising because there was no evidence adduced at the suppression hearing to support a finding of exigent circumstances.

The State bears the burden to show exigent circumstances that overcome the presumption of unreasonableness in the warrantless entry into a home. *Wengert v. State*, 364 Md. 76, 85, 771 A.2d 389 (2001). "Exigent circumstances are 'those in which a substantial risk of harm to the persons involved or to the law enforcement process would arise if the police were to delay a search until a warrant could be obtained.' " *Id.* (quoting *United States v. Robertson*, 606 F.2d 853, 859 (9th Cir. 1979)). Examples of such circumstances include "an emergency that requires immediate response; hot pursuit of a fleeing felon; and imminent destruction or removal of evidence." *Bellamy v. State*, 111 Md.App. 529, 534, 682 A.2d 1185 (1996).

Detective Jendrek testified that he and the ATT detectives entered the house at 3303 Round Road (using a ruse) to "continue the investigation" into the location of the stolen cell phone. He also testified that, although in some situations, for "officer safety [and] destruction of evidence," the police might employ a ruse to attempt to obtain consent to enter a house, in this case, if Smith had refused to give consent to enter the house, the officers, including the ATT detectives, would have left. It is worth noting, moreover, that the same technology the ATT detectives used to track down the stolen cell phone could have been used to trace its whereabouts, had someone removed it from the house; and that a cell phone, unlike many forms of contraband, is not easily and quickly destructible. In short, the record is devoid of evidence that the police entered the house at 3303 Round Road without a warrant due to exigent circumstances.

warrant supported by probable cause and lawfully seized the evidence in question. While not explicit in the State's brief, we perceive this to be an argument that the evidence was admissible under the independent source doctrine.[19]

 The independent source doctrine permits the admission of evidence "initially discovered unlawfully but subsequently lawfully obtained as a result of an independent source untainted by the initial illegality." *Williams v. State*, 372 Md. 386, 412–13, 813 A.2d 231 (2002) (citing *Murray v. United States*, 487 U.S. 533, 542, 108 S.Ct. 2529, 101 L.Ed.2d 472 (1988)). The policy that justifies the independent source doctrine is that,

> while the government should not profit from its illegal activity, neither should it be placed in a worse position than it would otherwise have occupied. So long as a later, lawful seizure is genuinely independent of an earlier, tainted one (which may well be difficult to establish where the seized goods are kept in the police's possession) there is no reason why the independent source doctrine should not apply.

*Murray*, 487 U.S. at 542, 108 S.Ct. 2529. Accordingly, the central question is whether "the search pursuant to warrant was in fact a genuinely independent source of the information and tangible evidence at issue." *Id.*

 Evidence is *not* "obtained by independent lawful means: (1) where the officer's 'decision to seek the warrant was prompted by what they had seen during the initial entry'; and (2) where 'information obtained during that entry was presented to the [judge] and affected his [or her] decision to issue the warrant.'" *Kamara v. State*, 205 Md.App. 607, 627–28, 45 A.3d 948 (2012) (quoting *Murray*, 487 U.S. at 542, 108 S.Ct. 2529). With respect to the latter scenario, the question is not whether the information presented in the warrant application actually affected the judge's decision but whether

---

**19.** The State does not use the phrase "independent source" in its brief or cite any of the case law pertaining to the independent source doctrine.

"after the constitutionally tainted information is excised from the warrant, the remaining information is sufficient to support a finding of probable cause." *Williams,* 372 Md. at 419, 813 A.2d 231.

We conclude that the independent source doctrine does not apply to the facts in this case. As discussed, Detective Cannida with the Western District was the affiant for the search warrant application. He testified at the suppression hearing that he pursued the search warrant only after being informed by Sergeant Santos, also with the Western District, that Detective Jendrek and the other ATT detectives had confirmed that the stolen cell phone was located inside 3303 Round Road. Detective Jendrek testified that he or another member of the ATT contacted Sergeant Santos only after they entered 3303 Round Road, dialed the number of the stolen cell phone, and, after hearing a cell phone ring, went upstairs and saw the stolen cell phone in the front bedroom. Finally, the State represented to the court at the suppression hearing that confirmation of the location of the stolen cell phone could not have been made until the ATT detectives entered 3303 Round Road, dialed the number of the stolen cell phone, and heard it ringing inside. Thus, all the information Detective Cannida attested to in applying for the search warrant (and on which the search warrant was granted) was the information relayed to him that was discovered during the initial illegal entry. On this basis alone, the search warrant was not issued based on an independent source untainted by the initial illegal entry.

Moreover, we also would conclude that the "information obtained during [the initial illegal entry] was presented to the [judge issuing the search warrant]" and, after excising that tainted information, the remaining information does not support a finding of probable cause. *Id.* at 419, 813 A.2d 231. The key averments in the search warrant application were that on "March 2, 2010 at approximately 4:00 pm" the ATT detectives "utilized sophisticated mobile and/or portable surveillance equipment" to locate the stolen cell phone; that "the aforementioned equipment indicated that the target phone was in the house located at 3303 Round Road"; that ATT detec-

tives "entered the location with the permission of the owners of the dwelling"; that Smith and Jones were the only occupants of the dwelling; that the stolen cell phone "was located at this address by Det. Jend[rek] using cellular site location data and received signal strength from the specific cellular telephone"; and that "advanced electronic directional finding equipment was able to pinpoint the precise location of the aforementioned handset." All of these averments purport to relate to the events occurring at or about 4:00 p.m. on March 2, 2010, when the ATT detectives were present in the 3300 block of Round Road.

While the record is not entirely clear on this subject, we understand Detective Jendrek's testimony at the suppression hearing to be that cell phone signal data led the ATT detectives to the approximate location of 3303 Round Road. Once at the scene, however, the police used the pedophile ruse to enter at least two houses: first 3305 Round Road and then 3303 Round Road. When they were unable to locate the stolen cell phone inside 3305 Round Road, they then used the ruse to enter 3303 Round Road. Detective Jendrek did not testify that the ATT used *any* "sophisticated mobile and/or portable surveillance equipment" while in the 3300 block of Round Road. Rather, his testimony was that the ATT detectives confirmed the precise location of the cell phone by use of ordinary police investigatory tactics: speaking to the occupants of two houses, dialing the number of the stolen cell phone, listening for it to ring, and, ultimately, physically observing the stolen cell phone lying on a dresser.

Thus, to the extent that the averments in the search warrant application represent that the ATT detectives used "sophisticated" means to locate the stolen cell phone while at the scene on the afternoon of March 2, 2010, they are simply inaccurate.[20] An accurate account of the means by which the

---

20. We note, as defense counsel and the trial court mused during the suppression hearing, that a search warrant application setting forth only the information obtained by the ATT detectives prior to their trip to Round Road on March 2, 2010, likely would have supported a finding

police confirmed the location of the stolen cell phone plainly would have relied on information obtained during the illegal entry and accordingly must be excised. For all of these reasons, the independent source doctrine does not serve to allow the admission of the evidence that should have been excluded.

## II. & III.

Given our resolution of the first issue, we need not consider the appellant's remaining contentions of error.

**JUDGMENTS REVERSED. CASE REMANDED TO THE CIRCUIT COURT FOR BALTIMORE CITY FOR FURTHER PROCEEDINGS. COSTS TO BE PAID BY THE MAYOR AND CITY COUNCIL OF BALTIMORE.**

---

of probable cause to search both 3305 Round Road and 3303 Round Road. The prosecutor strongly disagreed, however. In any event, the warrant application did not include averments about that aspect of the investigation.