**UNITED STATES OF AMERICA**

v.

**Henry BROWN**

**CRIMINAL ACTION NO.:
16–00047–BAJ–RLB**

United States District Court,
M.D. Louisiana.

Filed 01/31/2017

Michael Jerome Jefferson, United States Attorney's Office, Baton Rouge, LA, for Plaintiff.

## RULING AND ORDER

BRIAN A. JACKSON, CHIEF JUDGE UNITED STATES DISTRICT COURT MIDDLE DISTRICT OF LOUISIANA

Before the Court is the **Motion to Suppress Evidence and Statements (Doc. 18)** filed by Defendant. Defendant seeks to suppress evidence seized during a search of his residence on November 22, 2015. The United States of America ("Government") filed a memorandum in opposition to the Motion. (*See* Doc. 19). On November 3, 2016, the Court held an evidentiary hearing on the Motion. The Government and Defendant subsequently filed post-hearing briefs. (*See* Docs. 43, 44).

The facts of this case present a unique challenge, testing the precise limits that the Fourth Amendment places on the ability of law enforcement personnel to enter a person's home without a warrant and to use information obtained during such a warrantless entry to apply for a search warrant. For the reasons explained herein, Defendant's **Motion to Suppress Evidence and Statements (Doc. 18)** is **GRANTED**.

## I. BACKGROUND

At approximately 9:30 a.m. on November 22, 2015, Deputy William Lockwood ("Deputy Lockwood") of the East Baton Rouge Parish Sheriff's Office responded to a domestic disturbance call in Central, Louisiana. (Doc. 36, Hr'g Tr. at p. 15, ll. 24–25; id. at p. 16, ll. 3–7). Although the alleged domestic disturbance took place at 14630 Forest Grove Avenue, Central, Louisiana 70818,[1] (Doc. 18–1 at p. 1), Deputy Lockwood met the victim at a nearby gas station, (Doc. 36, Hr'g Tr. at p. 25, ll. 3–6). The victim alleged that her husband, Joshua Duke ("Duke"), was the only other person involved in the domestic disturbance[2] and informed Deputy Lockwood that Duke would be at the residence of his friend, "HB," (Doc. 36, Hr'g Tr. at p. 26, ll. 19–24; id. at p. 31, ll. 10–13), which was located at 3434 Lone Oak Drive, Baton Rouge, Louisiana 70814 ("Lone Oak Drive address"),[3] (id. at p. 16, ll. 3–14). After receiving that information and obtaining a description of Duke from the victim,[4] Deputy Lockwood contacted additional deputies who were assigned to the area in which the Lone Oak Drive address was located in order to secure their assistance in apprehending Duke. (Id. at p. 17, ll. 1–12). At approximately 11:44 a.m., Deputy Lockwood, along with Corporal Dustin Strickland ("Corporal Strickland") and Deputy Jared Arceneaux ("Deputy Arceneaux"), arrived at the Lone Oak Drive address. (Id. at p. 17, ll. 14–15). The officers testified that they approached the door of the residence that leads to the carport, knocked, and announced their presence. (Id. at p. 17, ll. 14–16). After demanding that any persons inside come to the door, Duke—who matched the description that the victim previously had given to Deputy Lockwood—opened the carport door, stepped outside, and identified himself. (Id. at p. 28, ll. 22–25; id. at p. 29, ll. 1–11; id. at p. 37, ll. 9–11). Duke was the only person who exited the residence, (see id. at p. 28, ll. 22–25; id. at p. 29, ll. 1–11; id. at p. 37, ll. 9–11), and the officers did not see or hear any indications that other persons were present in the house, (see id. at p. 74, ll. 2–7). In response to questioning by the officers and after being advised of his rights pursuant to Miranda v. Arizona, Duke allegedly told the officers initially that he did not know to whom the residence belonged and that he entered the residence upon determining that the door was open. (Id. at p. 17, ll. 24–25; id. at p. 18, ll. 1–2). Later, Duke allegedly stated that his friend, "HB"—whom the victim identified to Deputy Lockwood as the owner of the Lone Oak Drive address and as Duke's friend—may have been inside, but he was not sure if "HB" had left the residence. (Id. at p. 30, ll. 8–18; id. at p. 51, ll. 5–7). While in the carport area, officers claim to have detected the odor of marijuana, (id. at p. 31, ll. 14–16), and, through the open door, to have seen what appeared to be a marijuana cigarette and a knife[5] resting on top of an ottoman in the living room, (id. at p. 64, ll. 15–19). Duke admitted to the officers that he had been smoking mar-

---

1. Central, Louisiana, is a suburb of Baton Rouge, Louisiana.

2. There was no evidence presented that indicated that the domestic disturbance involved any physical contact. In fact, Deputy Lockwood testified that Duke "said that no physical contact" had occurred and that the disturbance consisted solely of an "argument about her job." Doc. 36, Hr'g Tr. at p. 18, l. 3–4.

3. The Lone Oak Drive address is located approximately eight miles from the scene of the alleged domestic disturbance.

4. The victim described Duke as a "tall, white male [with] tattoos." Doc. 36, Hr'g Tr. at p. 29, l. 3.

5. The knife that the officers allegedly observed was never seized by the police. See Ex. 1 at p. 4.

ijuana inside the residence before the officers arrived. (*Id.* at p. 33, ll. 18–20).

The officers testified that while they were questioning Duke, they saw what they perceived to be possible signs of forced entry on the carport door and doorframe; namely, the officers reported that they observed "splinters in the wood and cracks" on the doorframe where the lock engages, (*id.* at p. 18, ll. 20–21), burglar bars that had been "bent back," (*id.* at p. 39, l. 21), and mesh in the burglar-bar door that had been torn near the doorknob, (*id.* at p. 50, ll. 16–17).[6] The officers did not recover any burglary tools from Duke, however, and the officers did not observe any such tools in or around the carport area. (*Id.* at p. 72, ll. 5–7). Given their perceived state of the door and the doorframe, as well as Duke's initial responses that he did not know to whom the residence belonged, the officers made further announcements to determine if any additional persons were present in the house and to ensure that, if there were additional persons present, no one was injured or in need of aid. (*Id.* at p. 51, ll. 13–14). The officers received no response to their announcements, (*id.* at p. 51, l. 15), after which they further pushed open the already-ajar door to permit their announcements to be heard more clearly, (*id.* at p. 64, ll. 11–14). The officers again received no response, (*id.* at p. 51, l. 25), and Corporal Strickland testified that he did not "see any movement[,] see another person[,] or hear anybody talking," (*id.* at p. 74, ll. 6–7).

Despite the lack of indicia that other persons were present in the home and their ability to see—through the ajar carport door—that the interior of the home did not appear to have been rummaged through, (*see id.* at p. 73, ll. 6–10), the

officers apparently developed the belief that they had happened upon a burglary in progress—even though they had received information from Duke and the victim that Duke was friends with the homeowner, (*id.* at p. 41, ll. 15–17), and the officers testified that they had no reason to believe that Duke had left the scene of the domestic disturbance to commit a burglary, (*id.* at p. 30, ll. 19–22)—and "made the decision ... to go in and do ... a security sweep, just to make sure there[ was] nobody tied [up] or somebody ... injured [be]cause if [Duke] broke in, there[ was] no telling ... what happened," (*id.* at p. 52, ll. 1–4). Duke, however, did not appear to the officers to have been in a physical fight or confrontation. (*Id.* at p. 77, ll. 14–18). The officers then entered the residence to "clear it," in an effort to "look[ ] for a person [or] anybody hurt." (*Id.* at p. 52, ll. 8–9). The officers encountered no signs that the house had been burglarized upon entering the residence. (*Id.* at p. 73, ll. 6–13). After an "initial sweep" of the house, (*id.* at p. 19, ll. 17–18)—the purpose of which, according to the officers, was to ensure that "there[ was] not a threat or anything immediately present," (*id.* at p. 60, ll. 5–6)—the officers did not locate any persons, (*id.* at p. 19, ll. 17–18). The officers testified that they then conducted a "secondary search," which involved searching in places where a person could be hiding. (*Id.* at p. 60, l. 1). During the "secondary search," the officers entered a bedroom with an attached bathroom. (*Id.* at p. 52, ll. 9–14). The officers initially did not see a person in the bedroom or the bathroom, (*see id.* at p. 52, ll. 14–15), but observed a box on top of a cabinet in the bathroom, (*id.* at p. 52, ll. 16–19). Protruding from the top of the box, officers testified that they observed "what appeared to

---

6. The officers took no photographs of these alleged signs of forced entry, Doc. 36, Hr'g Tr. at p. 35, ll. 1–3, and thus the only evidence of their existence is the testimony of the officers themselves.

be a sizeable bag of marijuana." (*Id.* at p. 52, ll. 19–20). After noting the presence of the marijuana, the officers then noticed "a blanket [that] appeared to have a lump in it that looked abnormal" under the bed in the bedroom. (*Id.* at p. 52, ll. 23–24; *id.* at p. 53, l. 6). Corporal Strickland then "tapped [the lump under the blanket] with [his] foot" and discovered that a person was underneath the blanket. (*Id.* at p. 52, l. 25). After Corporal Strickland announced his and the other officers' presence, identified himself and the others as police officers, and demanded that the person under the blanket show his hands, the person under the blanket—Defendant—exposed his hands. (*Id.* at p. 53, ll. 11–12).

The officers then placed handcuffs on Defendant and brought him to the kitchen. (*Id.* at p. 53, ll. 13–14). After being advised of his rights under *Miranda*, Defendant told the officers his name and identified himself as the homeowner. (*Id.* at p. 54, ll. 10–13). The officers performed a routine warrant check using Defendant's name, which produced information indicating that there was a warrant for Defendant's arrest. (*Id.* at p. 54, ll. 20–21).

After securing Defendant, taking him to the kitchen, and completing their "sweep" of the house, (*id.* at p. 53, ll. 12–14), the officers returned to the bathroom and moved the box from which marijuana protruded so that they could see its contents, (*id.* at p. 73, ll. 1–2). Inside, officers observed "several pills, which [they] believed to be ecstasy[,] a bag of white powder [that] appeared to be cocaine, ... some bullets[,] and a little pill bottle with liquid in it [that] was probably codeine."[7] (*Id.* at p. 56, ll. 9–11, 14–15). The officers brought

to Defendant's attention their discovery of the box and its contents, but Defendant did not respond to any of their questions on the topic. (*Id.* at p. 54, ll. 23–25; *id.* at p. 55, ll. 1–2). Defendant declined to give the officers consent to search his home, (*id.* at p. 57, ll. 4–6), and was thereafter secured in a police vehicle, (*id.* at p. 58, ll. 4–5).

Because of the presence of what Corporal Strickland believed to be narcotics at the scene, he contacted his supervisor, who told Corporal Strickland to contact the narcotics division. (*Id.* at p. 57, ll. 6–13). Corporal Strickland contacted the narcotics division and "gave them a rundown of what [the officers] had [found]." (*Id.* at p. 57, ll. 15–17). The officers remained at the scene until Sergeant James Cooper ("Sergeant Cooper") arrived approximately thirty to forty minutes later. (*See id.* at p. 57, ll. 19–20; *id.* at p. 80, ll. 13–14).

Sergeant Cooper testified that "[w]hen [he] got there[, the officers] explained to [him] why they were there[,] how they entered the residence, [and] that they saw certain items in plain view." (*Id.* at p. 81, ll. 3–5). Sergeant Cooper again requested consent from Defendant to search his residence, but Defendant again refused to consent. (*Id.* at p. 81, ll. 10–12). Sergeant Cooper—who was well apprised of the facts leading to the officers' entrance into the house, (*see id.* at p. 89, ll. 3–13, 18–21; *id.* at p. 91, ll. 6–11), and who had entered the residence to view the box of contraband and its contents, (*id.* at p. 68, ll. 20–21)—then typed an application for a warrant to search the residence, (*id.* at p. 81, l. 14). The affidavit for the application for

---

7. The officers also found lightbulbs in the house that, according to Corporal Strickland's testimony, one of the officers believed to be used to grow marijuana. Doc. 36, Hr'g Tr. at p. 55, ll. 4–7. It is not clear where the officers found these lightbulbs, but they were located in "one room." *Id.* at p. 55, ll. 7–9. The lightbulbs were never seized by the police, however, *see* Ex. 1 at p. 4, and there was no evidence presented that the police encountered a marijuana grow operation in the house or that Defendant grew marijuana.

the search warrant, in relevant part, stated:

> Deputies stated that they went to 3434 Lone Oak Dr. in reference to a domestic disturbance. Deputies knocked on the carport door which was answered by a white male who was later identified as Joshua Duke. Upon speaking with Duke thru [sic] the open door, Deputies smelled the odor of freshly burnt marijuana coming from the residence. Deputies asked Duke if he lived at the residence. Duke stated that he did not. Deputies asked Duke who lived at the residence. Duke stated that he did not know. Deputies then asked Duke if anyone else was in the residence. Duke stated, "yes[,]" and then stated "no."
>
> Due to the smell of marijuana and Duke's lack apparent [sic] lack of knowledge of the questions asked by Deputies, he was secured by Deputies outside of the residence. Deputies then entered the residence to conduct a security sweep. Upon doing so, Deputies located a black male who was later identified as Henry Brown, hiding under the bed in the master bedroom, wrapped up in a blanket. He was secured by Deputies. Deputies completed the security sweep locating a partially smoked marijuana cigar in the living room in plain view. Deputies also saw an open box in the bathroom with an unlabeled pill bottle containing suspected promethazine syrup, a clear bag containing suspected marijuana and a clear bag containing suspected cocaine inside of it. Deputies also saw what appeared to be several pieces of equipment used to grow marijuana, throughout the residence. (Ex. 1 at p. 1)

Sergeant Cooper then presented the application for a search warrant to a commissioner, (Doc. 36, Hr'g Tr. at p. 83, ll. 15–19), who signed the search warrant at approximately 3:50 p.m., (id. at p. 92, ll. 2–4). Sergeant Cooper then called the narcotics detectives who had arrived at the Lone Oak Drive address and advised them that the search warrant had been signed. (Id. at p. 92, ll. 13–15).

The detectives then searched the residence and seized the previously described box and its contents, two scales, and a handgun. (Id. at p. 93, ll. 4–8). Defendant seeks to suppress the evidence seized pursuant to the search.

## II. LEGAL STANDARDS

■■■ It has long been established that "searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Arizona v. Gant*, 556 U.S. 332, 338, 129 S.Ct. 1710, 173 L.Ed.2d 485 (2009) (quoting *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967)). Generally, "[t]he proponent of a motion to suppress has the burden of proving, by a preponderance of evidence, that the evidence in question was obtained in violation of his Fourth Amendment rights." *United States v. Kelley*, 981 F.2d 1464, 1467 (5th Cir. 1993) (quoting *United States v. Smith*, 978 F.2d 171, 176 (5th Cir. 1992)). When a search is conducted without a warrant, however, the *government* bears the burden of proving that the search was valid. *United States v. Waldrop*, 404 F.3d 365, 368 (5th Cir. 2005) (citing *United States v. Castro*, 166 F.3d 728, 733 n.7 (5th Cir. 1999)).

## III. DISCUSSION

The facts of this case present the Court with two distinct issues: (1) whether the officers' warrantless entry into the residence and their subsequent "sweep" of the residence, during which the officers observed a box with marijuana protruding from the top and seized Defendant, was reasonable in light of an exception to the

general requirement that police obtain a warrant before entering a person's home, and (2) if the officers' warrantless entry into the residence and their subsequent "sweep" of the residence was *not* reasonable, whether the items seized during the subsequent search of the residence pursuant to the search warrant should be suppressed because the affidavit for the search warrant application contained information that was obtained through the initial unlawful "sweep." After considering the various rationale advanced by the Government, the positions advanced by Defendant, the facts of this case, and the applicable law, the Court concludes that the officers' initial entry into and "sweep" of the residence does not fall within any of the exceptions to the warrant requirement, and the items seized during the subsequent search of the residence pursuant to the search warrant must be suppressed.

## A. No Exception to the Warrant Requirement Justified the Officers' Initial Warrantless Entry and "Sweep" of the Residence

■ "It is a 'basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable." *Payton v. New York*, 445 U.S. 573, 586, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980) (quoting *Coolidge v. New Hampshire*, 403 U.S. 443, 477, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971)). "With few exceptions, the question whether a warrantless search of a home is reasonable and hence constitutional must be answered no." *Kyllo v. United States*, 533 U.S. 27, 31, 121 S.Ct. 2038, 150 L.Ed.2d 94 (2001). Among those exceptions are situations in which (1) the police have probable cause that a crime is being committed in a home *and* there are exigent circumstances that justify a warrantless entry into the home, *see Coolidge*, 403 U.S. at 468, 91 S.Ct. 2022; (2) the police reasonably believe that there is a "need to assist persons

[inside a home] who are seriously injured or threatened with such injury," *Brigham City v. Stuart*, 547 U.S. 398, 403, 126 S.Ct. 1943, 164 L.Ed.2d 650 (2006); (3) the police have a "reasonable, articulable suspicion that [a home] harbors an individual posing a danger to those on the scene," *United States v. Gould*, 364 F.3d 578, 587 (5th Cir. 2004), which permits the police, "without a warrant, to conduct a quick and limited search of [the] premises for the safety of the [officers] and others present at the scene," *United States v. Mendez*, 431 F.3d 420, 428 (5th Cir. 2005); (4) a search is conducted incident to a lawful arrest, *Chimel v. California*, 395 U.S. 752, 762–63, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969); and (5) other exigent circumstances are present that justify a warrantless entry into a residence, *United States v. Blount*, 123 F.3d 831, 837 (5th Cir. 1997).

## 1. There Was Neither Probable Cause that a Burglary Was Afoot Nor Any Exigent Circumstances that Justified the Officers' Entry into the Residence

■ Courts have found that a warrantless entry into a home is justified when officers perceive that a burglary is occurring and when that perception is coupled with exigent circumstances. *See, e.g., United States v. Getachew*, 364 Fed.Appx. 931, 933 (5th Cir. 2010). "Probable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Illinois v. Gates*, 462 U.S. 213, 232, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). "Exigent circumstances 'include those in which officers reasonably fear for their safety, where firearms are present, or where there is a risk of a criminal suspect's escaping or fear of destruction of evidence.'" *United States v. Rico*, 51 F.3d 495, 501 (5th Cir. 1995)

(quoting *United States v. Mendoza–Burciaga*, 981 F.2d 192, 196 (5th Cir. 1992)). For example, the United States Court of Appeals for the Fifth Circuit has held that officers were justified in entering a home without a warrant when officers were "dispatched to a robbery in progress[,] [t]hey were told a victim had seen men inside the house with guns[, and they] were also told two cars fled the area." *Getachew*, 364 Fed.Appx. at 933. The Fifth Circuit reasoned that even though the officers "did not know whether other suspects were still in the house" and a person on the scene told the officers that "he did not believe anyone else was in the house," it was reasonable for the officers to enter the house because "the residence's front door had been broken down[, a person] was ... bound in flexicuffs[,] and [that person] told the [o]fficers that some of the robbers had gone up to the residence's second floor." *Id.*

■ In this case, the officers were not dispatched to the Lone Oak Drive address in response to a burglary or robbery. In contrast, the officers in this case were told by a victim at a separate location that her alleged abuser would be located at the Lone Oak Drive address as a *guest* in that home; the residence belonged to his friend. (*Id.* at p. 26, ll. 19–24; *id.* at p. 31, ll. 10–13). The sole reason that officers were dispatched to the Lone Oak Drive address was to contact and apprehend Duke, the victim's alleged abuser. (*Id.* at p. 61, ll. 1–3).

After the officers arrived at the Lone Oak Drive address, knocked on the carport door, and announced their presence, Duke emerged and identified himself. (*Id.* at p. 17, ll. 14–16; *id.* at p. 28, ll. 22–25; *id.* at p. 29, ll. 1–11). Although Duke gave conflicting answers to the officers' questions regarding his presence at the house and whether there were other occupants present, (*see id.* at p. 17, ll. 24–25; *id.* at p. 18, ll. 1–2; *id.* at p. 30, ll. 8–18; *id.* at p. 51, ll. 5–7), the officers were aware from the earlier encounter with the victim that the residence belonged to Duke's friend, (*id.* at p. 26, ll. 19–24; *id.* at p. 31, ll. 10–13). The fact that the residence was owned by Duke's friend was confirmed by Duke himself, who ultimately provided the same name—"HB"—and the same information—that "HB" was his friend—to the officers in response to their questions about the residence, (*id.* at p. 30, ll. 8–18; *id.* at p. 51, ll. 5–7), as Deputy Lockwood received from the victim, (*id.* at p. 26, ll. 19–24; *id.* at p. 31, ll. 10–13). It therefore should have been evident to the officers that Duke was a *guest* in the house of his friend, "HB."

Thus, in order for the officers to believe that a burglary was in progress, they would have had to believe that Duke was burglarizing the home of his friend and the home at which they *expected* to find him.[8] In support of this peculiar contention, the Government directs the Court to the testimony of the officers that the carport door apparently was damaged in such a way that led them to believe that someone had burglarized the residence. (*See id.* at p. 18, ll. 20–21; *id.* at p. 39, l. 21; *id.* at p. 50, ll. 16–17). The officers, however, took no photographs of the condition of the door. (*Id.* at p. 35, ll. 1–3). Additionally, when they first arrived at the Lone Oak Drive address, the officers *knocked* on the same door that they claim was damaged to such an extent that the door exhibited possible signs of forced entry. (*Id.* at p. 17, ll. 14–16). Because the officers only suspected

---

**8.** The officers also would have had to believe that Duke, who admitted to the officers that he had been smoking marijuana inside the house, Doc. 36, Hr'g Tr. at p. 33, ll. 18–20, took a respite from his act of burglarizing the home of his friend to indulge in a marijuana cigarette.

that a burglary was in progress *after* knocking on the door and having spoken with Duke, (*see id.* at p. 18, ll. 20–21; *id.* at p. 39, l. 21; *id.* at p. 50, ll. 16–17), the testimony regarding the condition of the carport door appears to the Court to be a post hoc rationalization for the officers' entry into the residence, rather than evidence supporting a good-faith, reasonable belief that a burglary was afoot.

Further undercutting the officers' assertions that they believed a burglary was occurring, the officers found no burglary tools either at the scene or on Duke's person. (*Id.* at p. 72, ll. 5–7). Additionally, the officers could see into the house through the carport door, and they saw no signs or manifestations that a burglary had occurred inside the house, (*id.* at p. 73, ll. 6–13); they did not observe any movement or people inside the house; and they did not hear anyone talking, (*id.* at p. 74, ll. 6–7). Based upon Duke's appearance, he did not appear to have been in a fight or confrontation of any kind. (*Id.* at p. 77, ll. 14–18).

■ Moreover, the only crime that officers had probable cause to believe had been committed inside the residence was Duke's possession of a marijuana cigarette, which is a misdemeanor under Louisiana law. *See* La. Rev. Stat. § 40:966(E)(1). (*Id.* at p. 55, ll. 10–13; *id.* at p. 33, ll. 18–20). The officers had nothing more than unfounded suspicion that any other crime had occurred inside the residence. (*See id.* at p. 52, ll. 3–4) ("[I]f [Duke] broke in, there[ was] *no telling* ... what happened." (emphasis added)). In order to be convicted of simple burglary under Louisiana law, a person must make an "unauthorized entry [into] any dwelling, house, [or] apartment ... with the intent to commit a *felony* or any theft therein." *Id.* § 14:62.2 (emphasis added). Thus, even assuming that Duke did enter the residence without authorization or by force, the officers could

not have had probable cause to believe that a burglary was occurring because there was only probable cause to believe that a *misdemeanor* had occurred inside the dwelling.

These facts stand in stark contrast to the facts in *United States v. Getachew*, in which the Fifth Circuit held that the officers' perception of a burglary justified their warrantless entry into a residence. *See* 364 Fed.Appx. at 933. Unlike that case, the officers here were not dispatched to the residence specifically for a burglary or robbery of any kind, there were no circumstances that indicated that there were additional accomplices in the residence, there were no cars that reportedly had fled the scene, there were no victims present, and the door in this case had not been completely destroyed. *See id.* Therefore, given the facts of this case *as described by the officers themselves*, the officers' alleged perception of a possible burglary did not justify the warrantless entry into the residence.

### 2. The Officers' Belief that They Needed to Enter the Residence to Render Emergency Aid to Injured Persons Was Unreasonable

■ "[L]aw enforcement officers 'may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury.'" *Michigan v. Fisher*, 558 U.S. 45, 47, 130 S.Ct. 546, 175 L.Ed.2d 410 (2009) (quoting *Brigham City*, 547 U.S. at 403, 126 S.Ct. 1943). "This 'emergency aid exception' does not depend on the officers' subjective intent or the seriousness of any crime they are investigating when the emergency arises." *Id.* For the emergency-aid exception to apply, an officer must have " 'an objectively reasonable basis for believing' that 'a person within [the house] is in need of immediate aid.'" *Id.* (first quoting *Brigham City*, 547

U.S. at 406, 126 S.Ct. 1943; and then quoting *Mincey v. Arizona*, 437 U.S. 385, 392, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978)) (alteration in original) (citations omitted). "If 'reasonable minds may differ[,]' the courts should not second-guess the judgment of experienced law enforcement officers concerning the risks of a particular situation." *Blount*, 123 F.3d at 838. For example, in *Michigan v. Fisher*, the United States Supreme Court held that the warrantless entry into a residence was justified under the emergency-aid exception when "the police officers ... were responding to a report of a disturbance[;] encountered a tumultuous situation in the house[;] found signs of a recent injury, perhaps from a car accident outside"; and "could see violent behavior inside." 558 U.S. at 48, 130 S.Ct. 546. The Fifth Circuit has held that an officer was justified in entering a residence without a warrant pursuant to the emergency-aid exception when the officer "had an objectively reasonable belief that [a person inside] would imminently seriously injure himself" because the officer knew that the person "was suicidal[,] had a gun[,] had been drinking," and was seen "in his truck holding a gun to his head." *Rice v. ReliaStar Life Ins. Co.*, 770 F.3d 1122, 1132 (5th Cir. 2014).

▮ Here, the officers "made the decision ... to go in and do ... a security sweep, just to make sure there[ was] nobody tied [up] or somebody ... injured [be]cause if [Duke] broke in, there[ was] no telling ... what happened." (*Id.* at p. 52, ll. 1–4). The officers could see into the house through the carport door, but they saw no signs of a struggle, (*id.* at p. 73, ll. 6–13), they did not observe any movement or people inside the house, and they did not hear anyone talking, (*id.* at p. 74, ll. 6–7). Additionally, Duke did not appear to have been in a fight or confrontation of any kind. (*Id.* at p. 77, ll. 14–18). The officers were not dispatched to the Lone Oak Drive address in response to a report of a disturbance *at that address*, there were no signs of violence at the scene, and the interior of the home appeared to be a peaceful scene. *Cf. Fisher*, 558 U.S. at 48, 130 S.Ct. 546 (holding that a warrantless entry into a residence was justified under the emergency-aid exception when "the police officers ... were responding to a report of a disturbance[;] encountered a tumultuous situation in the house[;] found signs of a recent injury, perhaps from a car accident outside"; and "could see violent behavior inside"). Put simply, the officers did not have " 'an objectively reasonable basis for believing' that 'a person within [the house was] in need of immediate aid,' " *Fisher*, 558 U.S. at 47, 130 S.Ct. 546, as evidenced by the testimony of Corporal Strickland himself, who stated that there was "*no telling* ... what happened" inside the home. (*Id.* at p. 52, l. 4 (emphasis added)).

### 3. The Officers Did Not Have a Reasonable, Articulable Suspicion that the Residence Harbored an Individual Posing a Danger to Those on the Scene, and Thus the Officers' Entry into the Residence to Perform a Protective Sweep Was Unreasonable

▮ "The protective sweep doctrine allows government agents, without a warrant, to conduct a quick and limited search of premises for the safety of the agents and others present at the scene." *Mendez*, 431 F.3d at 428. "A protective sweep of a house is legal if ... (1) the government agents have a 'legitimate law enforcement purpose' for being in the house[,] (2) the sweep is 'supported by a reasonable, articulable suspicion that the area to be swept harbors an individual posing a danger to those on the scene[,]' (3) the sweep is 'no more than a cursory inspection of those spaces where a person may be found[,]' and (4) the sweep 'last[s] no longer than is

necessary to dispel the reasonable suspicion of danger' and 'last[s] no longer than the police are justified in remaining on the premises.'" *Id.* (quoting *Gould*, 364 F.3d at 587). If officers have "reasonable grounds to believe there [are] people inside the house who pose[ ] a security risk," the officers may conduct a protective sweep of a residence even if a suspect is arrested *outside* of the residence in question. *See id.* (citing *United States v. Watson*, 273 F.3d 599, 603 (5th Cir. 2001)). Courts have held that when a person is suspected of having additional accomplices, *see, e.g.*, *Watson*, 273 F.3d at 601, or when an additional, known criminal is suspected of living at the house, *see Alexander v. Smith*, 561 Fed.Appx. 421, 425 (5th Cir. 2014), officers are justified in making a warrantless entry into a home to perform a protective sweep.

■ In this case, the officers do not appear to have been motivated to enter the house primarily because of their fear of other dangerous persons that might be present inside the residence. Rather, the officers claim that they were motivated primarily by a desire to ensure that no one inside the house was injured. Corporal Strickland testified that he "made the decision ... to go in and do ... a security sweep, just to make sure there[ was] nobody tied [up] or somebody ... injured [be]cause if [Duke] broke in, there[ was] no telling ... what happened." (*Id.* at p. 52, ll. 1–4). Only after the suggestion from counsel did Corporal Strickland indicate that the officers also may have been looking for other perpetrators. (*See id.* at p. 52, ll. 6–7). Corporal Strickland, in response to a question from the Court, testified that he "did[ not] know" what he expected to find inside and that he primarily was "concern[ed]" about whether "anybody [was] injured." (*Id.* at p. 73, ll. 20, 25).

In an effort to demonstrate that there were reasonable grounds to believe that there were people inside the house who posed a security risk, the Government directs the Court to the evidence that indicates that Duke told the officers that he did not know whether anyone else was home and that his friend "HB" might have been home. (*See id.* at p. 17, ll. 24–25; *id.* at p. 18, ll. 1–2; *id.* at p. 30, ll. 8–18; *id.* at p. 51, ll. 5–7). The officers, however, did not observe any movement or people inside the house, and they did not hear anyone talking. (*Id.* at p. 74, ll. 6–7). Further, the police had no reason to believe that Duke had an accomplice in connection with the earlier domestic disturbance, (*id.* at p. 31, ll. 10–13), and the sole reason that the officers were dispatched to the Lone Oak Drive address was to apprehend Duke for his connection with the earlier domestic disturbance, (*id.* at p. 61, ll. 1–3). *Cf. Watson*, 273 F.3d at 601 (holding that a warrantless protective sweep was justified when the arrestee was suspected of having accomplices). Additionally, even though the officers were aware that "HB" *may* have been inside the residence, the officers did not know the identity of "HB," (*id.* at p. 31, ll. 8–9), let alone that "HB" had a criminal history or posed a security risk. *Cf. Alexander*, 561 Fed.Appx. at 425 (holding that officers were justified in conducting a warrantless protective sweep when, among other things, the arrestee's adult son had a criminal history).

Given that the officers did not appear to enter the home because they feared that someone inside might launch an attack, that the officers had no information that indicated that Duke had an accomplice or that a dangerous person was present in the home, and that the officers saw no movement or persons in the house and did not hear anyone talking, the officers lacked "a reasonable, articulable suspicion that the area to be swept harbor[ed] an individual posing a danger to those on the scene," and thus a protective sweep of the resi-

dence was not justified and therefore unreasonable. *Mendez*, 431 F.3d at 428.

#### 4. The "Sweep" Exceeded the Permissible Scope of a Search Incident to Arrest

 "In *Chimel* [*v. California*]," the Supreme Court "held that a search incident to arrest may only include 'the arrestee's person and the area within his immediate control—construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence.'" *Gant*, 556 U.S. at 339, 129 S.Ct. 1710 (quoting *Chimel*, 395 U.S. at 736, 89 S.Ct. 2034). "That limitation, which continues to define the boundaries of the exception, ensures that the scope of a search incident to arrest is commensurate with its purposes of protecting arresting officers and safeguarding any evidence of the offense of arrest that an arrestee might conceal or destroy." *Id.* "If there is no possibility that an arrestee could reach into the area that law enforcement officers seek to search, both justifications for the search-incident-to-arrest exception are absent and the rule does not apply." *Id.*

When the officers initially entered the home, Duke was detained in a police vehicle. (*Id.* at p. 18, ll. 4–5). Duke therefore could not have reached inside the house, let alone into the bedroom in which Defendant was found or the bathroom in which the box of contraband was observed. Thus, the search exceeded the permissible scope of a search incident to arrest. *See id.*

#### 5. There Were No Other Exigent Circumstances that Justified the Officers' Entry into the Residence

 "Although a warrantless entry into a home is presumptively unreasonable, entry may be justified by exigent circumstances." *Blount*, 123 F.3d at 837. "In evaluating whether exigent circumstances existed," the Fifth Circuit has "found relevant the following factors":

(1) the degree of urgency involved and the amount of time necessary to obtain a warrant[,]

(2) [the] reasonable belief that contraband is about to be removed[,]

(3) the possibility of danger to the police officers guarding the site of contraband while a search warrant is sought[,]

(4) information indicating the possessors of the contraband are aware that the police are on their trail[,] and

(5) the ready destructibility of the contraband and the knowledge that efforts to dispose of narcotics and to escape are characteristic behavior of persons engaged in ... narcotics traffic[king].

*Rico*, 51 F.3d at 501 (internal quotation marks omitted).

"[T]he presence of drugs alone does not give rise to exigent circumstances justifying a warrantless entry and search." *United States v. Howard*, 106 F.3d 70, 74 (5th Cir. 1997).

 There appears to have been no exigency that would justify the officers' warrantless entry into the home. Although the officers could observe a marijuana cigarette from the already-ajar carport door, (*id.* at p. 64, ll. 15–19), the presence of the marijuana cigarette alone did not give rise to an exigency. *Id.* Given that the officers only observed one marijuana cigarette, (*id.* at p. 64, ll. 15–19)—a recreational quantity, possession of which is a misdemeanor pursuant to Louisiana Revised Statutes section 40:966—that Duke admitted that he was smoking the marijuana cigarette and was already in custody, (*see id.* at p. 18, ll. 4–5; *id.* at p. 33, ll. 18–20); and that the officers had no reason to believe at the time that any additional contraband might be located in the residence, there was no particular urgency in entering the home. *See United States v. Menchaca–Castruita*, 587 F.3d 283, 294 (5th Cir. 2009). The officers could see, by virtue of the already-ajar carport door, if a person attempted to

dispose of or destroy the marijuana cigarette, (*see id.* at p. 64, ll. 15–19), saw no movement or persons in the house, and did not hear anyone talking, (*id.* at p. 74, ll. 6–7), thereby undercutting any belief that the marijuana cigarette would be removed or destroyed. *See id.* at 293. The Court also notes that there is neither testimony nor any other indication that the officers entered the home without a warrant because they feared that contraband would be concealed or destroyed. There was no evidence presented that indicated that it would have been dangerous for the officers to remain at the scene while a warrant was obtained. *See id.* at 294. In fact, following their entry into the residence, the officers remained at the scene without incident while a warrant was obtained. (*Id.* at p. 57, ll. 19–20; *id.* at p. 80, ll. 13–14). Additionally, no exceptional circumstances impeded the officers from obtaining a warrant: the officers had "ready access to a magistrate," as evidenced by Sergeant Cooper's obtaining a warrant. *Id.* (*Id.* at p. 83, ll. 15–19). Thus, there were no exigent circumstances that justified the officers' warrantless entry into the residence.

The Court also notes that if the officers *had* applied for a search warrant based on the facts available to them at the time, that search warrant would not have permitted them to conduct the broad, expansive "sweep" of Defendant's entire home that the officers subsequently conducted under the guise of exigent circumstances. The officers detected the odor of marijuana; saw, through an ajar door, a recreational amount of marijuana in the living room of a house; and had already arrested a person who had admitted to smoking the marijuana and who was not the owner of that house. The officers thus had probable cause to believe that the person whom they had in custody had committed a misdemeanor in the home of another person and that evidence of the misdemeanor was located in the living room of that resi-

dence. A warrant that would have authorized the officers to enter the home to conduct a search broader than would be necessary to seize only the marijuana cigarette—the evidence of the misdemeanor—would not have been supported by probable cause and would have failed to conform to the particularity requirement. *See Groh v. Ramirez*, 540 U.S. 551, 559, 124 S.Ct. 1284, 157 L.Ed.2d 1068 (2004) ("The uniformly applied rule is that a search conducted pursuant to a warrant that fails to conform to the particularity requirement of the Fourth Amendment is unconstitutional." (quoting *Massachusetts v. Sheppard*, 468 U.S. 981, 988 n.5, 104 S.Ct. 3424, 82 L.Ed.2d 737 (1984))).

Pursuant to the analysis above, no exceptions to the warrant requirement are applicable to the facts of this case. Therefore, the officers' warrantless entry into the house was an unreasonable search in violation of the Fourth Amendment, and the observations of the box of contraband and the marijuana protruding from that box, as well as the initial seizure of Defendant, were obtained pursuant to an unlawful and unconstitutional search.

**B. The Officers Conducted an Unlawful Search of the Box, Regardless of Whether Exigent Circumstances Justified the Officers' Initial Entry into the Residence**

Even assuming that there were exigent circumstances that justified the officers' initial warrantless entry into the residence—and the Court finds, for the reasons stated above, that there were *no* such exigent circumstances—their subsequent act of returning to the bathroom and moving the box of contraband to view its contents was an unlawful search because it occurred after any such hypothetical exigent circumstance had ceased. "[A] warrantless search must be 'strictly circumscribed by the exigencies which justify its initiation.'" *Mincey*, 437 U.S. at 393, 98

S.Ct. 2408. If the need to render emergency aid justifies the warrantless entry into a home, for example, police cannot continue to search a residence after the injured person has been tended to. *See United States v. Davis*, 423 F.2d 974, 980 (5th Cir. 1970) (holding that the emergency-aid exception did not justify a search of a house that was conducted after an injured person had been removed from the scene by ambulance because "the emergency ceased to exist when the ambulance departed").

As stated above, Corporal Strickland testified that he "made the decision . . . to go in and do . . . a security sweep, just to make sure there[ was] nobody tied [up] or somebody . . . injured [be]cause if [Duke] broke in, there[ was] no telling . . . what happened," (*id.* at p. 52, ll. 1–4), although he did indicate, after the suggestion from counsel, that the officers also may have been looking for other perpetrators. (*See id.* at p. 52, ll. 6–7). Thus, the officers' proffered exigent circumstances to justify their warrantless entry into the house are the emergency-aid exception and the suspicion that the house harbored a person who posed a security risk to those on the scene. Even assuming that these exigent circumstances justified the officers' initial warrantless entry into the residence—which they did *not*—once the officers had swept the entire house to ensure that there were no injured or dangerous persons present, the hypothetical exigency ceased to justify any further search of the

home. *See Mincey*, 437 U.S. at 393, 98 S.Ct. 2408; *Davis*, 423 F.2d at 980.

Although the officers observed the box and the marijuana that protruded from it during their "sweep" of the residence, during which they claim to have been searching for injured or dangerous persons, they simply "made a note" of the box's presence at that time, (*id.* at p. 52, l. 21), and continued to "sweep" the entire house, (*see id.* at p. 53, ll. 14–15). Only after placing Defendant in handcuffs, completing their "sweep" of the entire house, and taking Defendant to the kitchen, (*id.* at p. 53, ll. 12–14; *id.* at p. 73, ll. 1–2), did officers return to the bathroom to "pull down [and] look[ ] in" the box to discover its various contents, (*id.* at p. 54, ll. 24–25). Thus, at the time the officers returned to the bathroom to view the contents of the box, there was no possibility that injured or dangerous persons were present in the house because the officers already had searched the entire home, finding only Defendant.[9]

Therefore, the officers' act of returning to the bathroom to remove the box from the cabinet to view its contents—after securing Defendant, taking Defendant to the kitchen, and conducting a "sweep" of the entire house for other persons who might have been present—exceeded "the exigencies which justif[ied] its initiation,'" even assuming that those exigencies were legitimate.[10] *Mincey*, 437 U.S. at 393, 98 S.Ct. 2408; *accord Davis*, 423 F.2d at 980.

---

**9.** For similar reasons, there also was no possibility that the box of contraband would have been concealed or destroyed in the time it would have taken to obtain a search warrant; after completing their "sweep," the officers knew that there were no persons inside the house who could conceal or destroy the contraband in the box.

**10.** The Court does not suggest that the officers could not have moved the box to view its contents *during* their "sweep" of the residence *if* there were exigent circumstances to

justify the officers' warrantless entry into the house and *if* that hypothetical exigency was still present *at the time the officers moved the box.* Such a situation would fall squarely within the Supreme Court's holding in *Arizona v. Hicks*, 480 U.S. 321, 107 S.Ct. 1149, 94 L.Ed.2d 347 (1987). To be clear, the Court finds, first, that there were no exigent circumstances that justified the officers' warrantless entry into the home and, second, that the officers returned to the bathroom and moved the box to view its contents only *after* any such hypothetical exigency had ceased.

## C. The Good Faith Exception Does Not Permit the Introduction of Evidence Seized During the Subsequent Search Performed Pursuant to the Search Warrant

Having determined that the officers unlawfully entered and searched Defendant's residence, the Court turns to the question of whether the officers could rely on the information they obtained from the unlawful search to apply for a search warrant, which would allow the officers to seize the contraband they observed during the initial unlawful search and to search for additional contraband in the residence. When the officers entered Defendant's residence without the benefit of a warrant or an exception to the warrant requirement, the constitutional injury to Defendant had already been inflicted. In essence, the Court is tasked with determining whether officers can utilize information they acquired as a result of that constitutional injury to apply for and obtain a search warrant and to thereby sanitize their unlawful conduct.

■ Because "the exclusionary rule is designed to deter police misconduct," *United States v. Leon*, 468 U.S. 897, 916, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), the guiding principle in this analysis is whether suppression of the evidence derived from the search would "deter[ ] official lawlessness," *United States v. Woerner*, 709 F.3d 527, 534 (5th Cir. 2013) (quoting *Gates*, 462 U.S. at 258, 103 S.Ct. 2317); *see also United States v. Massi*, 761 F.3d 512, 528 (5th Cir. 2014) (holding that evidence seized pursuant to a warrant should not be suppressed because, under the circumstances of the case, suppression "would not

serve the interest of deterring future constitutional violations"). For example, the Fifth Circuit has held that "if [an] officer applying for [a] warrant knew or had reason to know that the information [included in the affidavit] was tainted and included it anyway without full disclosure and explanation, then suppressing the evidence seized pursuant to that warrant 'pay[s] its way by deterring official lawlessness.'" *Woerner*, 709 F.3d at 534 (quoting *Gates*, 462 U.S. at 258, 103 S.Ct. 2317).

"[W]hen it comes to the Fourth Amendment, the home is first among equals." *Florida v. Jardines*, 569 U.S. 1, 133 S.Ct. 1409, 1414, 185 L.Ed.2d 495 (2013) (Scalia, J.). At its "very core," the Fourth Amendment protects "the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." *Silverman v. United States*, 365 U.S. 505, 511, 81 S.Ct. 679, 5 L.Ed.2d 734 (1961). Because of the primacy of the home in our Fourth Amendment jurisprudence, the need to deter police misconduct is *most* important when, as here, the police cross the "firm line at the entrance to the house" that the "Fourth Amendment has drawn" in order to search a person's home without a warrant and when no exigent circumstances present themselves. *Payton*, 445 U.S. at 590, 100 S.Ct. 1371.

In furtherance of the principle of deterring police misconduct, Courts of Appeals have held that the good faith exception to the exclusionary rule is not available when officers use information acquired from an unlawful search to subsequently apply for a search warrant, thereby holding that the

---

The Court also notes that Sergeant Cooper's act of entering the residence to view the contents of the box upon arriving at the scene similarly was an unlawful warrantless entry into the residence. *See* Ex. 1 at p. 1. Even assuming that there were exigent circumstances that justified the initial warrantless entry by the officers—and, again, the Court

finds that there were not—that exigency had ceased long before the arrival of Sergeant Cooper, who reached the scene thirty to forty minutes after the officers had completed their "sweep" of the residence. *See Mincey,* 437 U.S. at 393, 98 S.Ct. 2408; *Davis,* 423 F.2d at 980.

evidence seized pursuant to the warrant should be suppressed pursuant to the exclusionary rule. *See e.g., United States v. McGough*, 412 F.3d 1232, 1239–40 (11th Cir. 2005); *United States v. Vasey*, 834 F.2d 782, 789–90 (9th Cir. 1987). The Fifth Circuit, recognizing that this "is not territory frequented in [its] jurisprudence," has taken a different approach, however, holding that the good faith exception applies in certain situations in which tainted evidence is included in an affidavit for a search warrant. *Massi*, 761 F.3d at 525. The Fifth Circuit recently held that "evidence seized pursuant to a warrant is admissible—even if the warrant was the product of an illegal search—if two requirements are met." *United States v. Holley*, 831 F.3d 322, 326 (5th Cir. 2016). First, "the prior law enforcement conduct that uncovered evidence used in the affidavit for the warrant must be 'close enough to the line of validity' that an objectively reasonable officer preparing the affidavit or executing the warrant would believe that the information supporting the warrant was not tainted by unconstitutional conduct." *Massi*, 761 F.3d at 528. Second, "the resulting search warrant must have been sought and executed by a law enforcement officer in good faith as prescribed by [*United States v.*] *Leon*." *Id.*

### 1. An Objectively Reasonable Officer Preparing the Affidavit Would Have Believed that the Information Supporting the Warrant Was Tainted by Unconstitutional Conduct

 In determining whether "an objectively reasonable officer preparing the affidavit ... would [have] believe[d] that the information supporting the warrant was not tainted by unconstitutional conduct," the Court must consider what an objectively reasonable officer would have believed if she were presented with the same information as the officer who actually prepared the affidavit for the search warrant. *Id.* In this case, Sergeant Cooper prepared the affidavit for the search warrant. Sergeant Cooper arrived at the scene thirty to forty minutes after the unlawful search of the residence occurred, (*see id.* at p. 57, ll. 19–20; *id.* at p. 80, ll. 13–14), and relied on the information relayed to him by the officers who conducted the unlawful search to write the affidavit, (*see id.* at p. 96, ll. 21–25; *id.* at p. 97, l. 1).

Sergeant Cooper testified that he was informed by the officers on the scene that (1) the officers initially were responding to the Lone Oak Drive address because of a domestic disturbance, (*id.* at p. 95, l. 18); (2) the officers were at the Lone Oak Drive address to make contact with Duke, (*id.* at p. 89, ll. 3–4); (3) the officers knocked on the carport door, "made contact with him at the door[, and] upon speaking with him through ... the side door, they asked him if he lived there[ –] he stated he did not[—and] they asked if he knew who lived there[ –] he stated he did not," (*id.* at p. 89, ll. 5–8); (4) in response to the officers' questions regarding the presence of anyone else in the residence, Duke responded that "he was[ not] sure," before changing his mind multiple times and stating that "maybe somebody named HB [was] in the residence," (*id.* at p. 89, ll. 11–13); (5) the officers detected the odor of marijuana, (*id.* at p. 89, ll. 10–11); (6) the officers suspected that a burglary was afoot sometime after arriving at the residence, (*id.* at p. 101, ll. 18–21); and (7) officers then conducted a "security sweep inside the residence," (*id.* at p. 89, l. 21). Sergeant Cooper claims that he was *not* aware (1) that the actual domestic disturbance occurred at another location, (*id.* at p. 100, ll. 8–11), and (2) of the particular role that either Duke or Defendant played in the domestic disturbance, (*id.* at p. 101, ll. 10–11).

The Court finds that an "objectively reasonable officer," assuming the role of Ser-

geant Cooper, would *not* have "believe[d] that the information supporting the warrant was not tainted by unconstitutional conduct." *Id.* Sergeant Cooper was aware that the officers arrived at the scene for the purpose of making contact with Duke, (*id.* at p. 89, ll. 3–4), and thus an objectively reasonable officer would not have believed that the officers were responding to the scene of an *active* domestic disturbance. Sergeant Cooper also was aware that the officers did not initially enter the house to conduct a security sweep—the officers only entered the house after questioning Duke, (*see id.* at p. 89, l. 21)—and thus an objectively reasonable officer would not have believed that the officers were concerned about any potential victims of a domestic disturbance that might be located inside; otherwise, the officers would have entered the residence upon arriving at the scene or very shortly thereafter. Based on the information available to Sergeant Cooper, an objectively reasonable officer would not have believed that there were any exigent circumstances connected to the alleged domestic disturbance that would justify a warrantless entry into the home.

Sergeant Cooper was also aware that, at some point after questioning Duke, the officers claim that they suspected that a burglary was afoot, (*id.* at p. 101, ll. 18–25; *id.* at p. 102, ll. 1–2), primarily due to the possible signs of forced entry they allegedly observed on the carport door, (*id.* at p. 101, ll. 23–24). Sergeant Cooper additionally was aware that the officers initially made contact with Duke at and knocked on *that same door*, could see inside of the home through the open door, and did not *at that point* suspect that a burglary was in progress. (*See id.* at p. 89, ll. 4–8). Sergeant Cooper was aware that at some point, Duke stated that his friend, "HB," may have been inside the residence. (*Id.* at p. 95, ll. 19–25). Based on this information, an objectively reasonable officer would not

have believed that the officers were justified in making a warrantless entry into the residence for reasons related to the alleged burglary. It is objectively *unreasonable* for an officer to believe that, although the responding officers were at the Lone Oak Drive address for the *purpose* of making contact with Duke in connection with a domestic disturbance—which implied that they knew that Duke would be at the residence—they then suspected him of burglarizing that *same* residence. To make such a peculiar deduction, an objectively reasonable officer would have required more facts that indicated that a burglary indeed had taken place, and those facts simply were not present in this case. For example, an objectively reasonable officer would have understood, from the information available to Sergeant Cooper, that the officers who arrived at the scene could see into the home when they arrived and initiated contact with Duke at the very door that they later claimed to have exhibited possible signs of forced entry, but did not *then* suspect a burglary was afoot. These facts undercut the reasonableness of their *later* perception that a burglary was in progress. Taken together with the fact that Sergeant Cooper knew that Duke had said that his friend, "HB," might be home and the corresponding implication that the residence therefore might belong to Duke's friend, (*id.* at p. 89, ll. 11–13), an objectively reasonable officer would not have believed that there were any exigent circumstances connected to the alleged perceived burglary.

An objectively reasonable officer would have been aware of the longstanding constitutional principle that officers may not make a warrantless entry into a house without exigent circumstances that justify such entry, *see Payton*, 445 U.S. at 590, 100 S.Ct. 1371, and thus that officer would not have believed, based on the information available to Sergeant Cooper, that

exigent circumstances connected to either the domestic disturbance or the alleged perceived burglary would justify the warrantless entry in this case. Further, an objectively reasonable officer would have known that the presence of contraband *alone* does not justify the warrantless entry into a residence, *Howard*, 106 F.3d at 74, and thus would not have believed that the odor of marijuana alone would have justified the warrantless entry in this case. This is *not* a case in which the "prior law enforcement conduct that uncovered evidence used in the affidavit for the warrant [was] 'close enough to the line of validity.'" *Massi*, 761 F.3d at 528. Rather, the officers' warrantless entry into Defendant's home does not even *approach* the "line of validity," and the resulting violation of Defendant's Fourth Amendment rights is quite clear. Therefore, the evidence later seized pursuant to the search warrant is inadmissible.

### 2. The Resulting Search Warrant Was Not Sought in Good Faith as Prescribed by Leon

 If the officer preparing the affidavit for the search warrant application "knowingly hide[s] or misrepresent[s] the course and duration of the investigation" leading to the unlawful search, "making [the magistrate] unaware of a constitutional violation, such action could be seen as equivalent to misleading the magistrate by falsities in the affidavit or statements that are in reckless disregard of the truth under the first *Leon* scenario." *Id.* at 531. "[F]ailure to acknowledge constitutional violations that led to the discovery of the evidence in the affidavit could similarly lead to the unavailability of the good faith exception under *Leon.*" *Id.*

Beyond preparing the affidavit in a careless manner, Sergeant Cooper made four knowing omissions in the affidavit for the search warrant application, the collective effect of which misrepresented to the magistrate the "course of the investigation" leading to the unlawful search. *Id.* Sergeant Cooper knowingly omitted from the affidavit that (1) the officers arrived at the scene for the *purpose* of making contact with Duke, (*id.* at p. 89, ll. 3–4); (2) the officers on the scene suspected, after questioning Duke, that a burglary was afoot, (*id.* at p. 101, ll. 18–25; *id.* at p. 102, ll. 1–2); (3) the officers suspected a burglary was afoot primarily from the possible signs of forced entry that they allegedly observed on the carport door, (*id.* at p. 101, ll. 23–24), even though the officers initially *knocked* on that very door when they first arrived at the scene, could see into the house through the open door, and did not *at that point* suspect that a burglary was in progress (*see id.* at p. 89, ll. 4–8); and (4) Duke stated that his friend, "HB," may have been inside the residence, (*id.* at p. 95, ll. 19–25). In fact, the affidavit does not include even a *single* reference to a burglary, (*see* Ex. 1 at p. 1), despite Sergeant Cooper's awareness that the officers suspected that a burglary was afoot and that the officers entered the residence primarily because of that alleged suspicion, (*see* Doc. 36, Hr'g Tr. at p. 101, ll. 18–24).

If these omissions were included in the affidavit, a different picture of the events that transpired at the Lone Oak Drive address would have emerged to the magistrate, and the magistrate would have been aware of the constitutional violation that took place as a result of the officers' warrantless entry into the residence. If these facts were included, the magistrate would have been aware that the officers peculiarly were claiming to have happened upon Duke's burglarizing the same home at which they *expected* to find him in connection with a domestic disturbance. The magistrate also would have been aware that Duke told the officers that his friend, "HB," might be inside the residence, further calling into doubt the al-

leged perceived burglary. Additionally, the magistrate would have been aware that the officers did not suspect that a burglary was afoot when they first arrived to the scene and first saw the door and the interior of the home. The affidavit, with the omitted facts included, clearly would have demonstrated that because the officers only later claimed to have suspected a burglary—minutes after observing the door and the interior of the home—and because the officers were asserting that Duke was nonsensically burglarizing the home at which they expected him to be and that which had some connection to his friend, there were no exigent circumstances connected to the alleged perceived burglary that would have justified the officers' warrantless entry into the residence. If Sergeant Cooper had not omitted the fact that officers arrived on the scene for the purpose of making contact with Duke, the magistrate also would have been aware that the officers were not responding to an *active* domestic disturbance that may have justified a warrantless entry into the residence for the purpose of rendering emergency aid to any possible victims.

Sergeant Cooper also falsely claimed in the affidavit that "[d]eputies saw what appeared to be several pieces of equipment used to grow marijuana ... *throughout the residence*." (*Ex.* 1 at p. 1). The officers who initially entered the home and conducted the sweep merely found "bulbs," which Corporal Strickland had "never really seen before" and about which the officers merely speculated regarding their purpose. (Doc. 36, Hr'g Tr. at p. 55, ll. 4–7). Corporal Strickland also testified definitively that the lightbulbs were in "one room." (*Id.* at p. 55, l. 8). The officers also did not encounter any other evidence of a marijuana grow operation during their "sweep" of the entire house. Thus, the only information that could have been available to Sergeant Cooper regarding "pieces of

equipment used to grow marijuana ... throughout the residence"—at the time he was preparing the affidavit for the search warrant—was that the officers found lightbulbs in one room. Therefore, Sergeant Cooper's assertion in the affidavit that the officers found "what appeared to be several pieces of equipment used to grow marijuana ... *throughout the residence*" was a knowing and patent falsity. The false nature of this assertion is brought into further focus by the fact that the detectives did not seize those very lightbulbs that Sergeant Cooper claimed were connected to a marijuana grow operation that spanned the entire house. (*See* Ex. 1 at p. 4). Sergeant Cooper thus not only knowingly omitted facts that misrepresented to the magistrate the constitutional violation that took place, but also knowingly misrepresented what the officers had found during the unconstitutional search.

Thus, the evidence seized pursuant to the search warrant in this case is inadmissible because Sergeant Cooper, in writing the affidavit, "knowingly hid[ ] or misrepresented the course ... of the investigation to the magistrate," thereby "making [the magistrate] unaware of the constitutional violation," which is the "equivalent to misleading the magistrate by falsities in the affidavit or statements that are in reckless disregard of the truth under the first *Leon* scenario." *Id.* Therefore, the fruits of the search conducted pursuant to the search warrant in this case must be suppressed.

Suppression of this evidence "serve[s] the interest of deterring future constitutional violations." *Id.* at 532 (citing *Leon*, 468 U.S. at 919–20, 104 S.Ct. 3405). The officers in this case arrived to the Lone Oak Drive address for the *sole* purpose of apprehending Duke for his connection with a domestic disturbance that occurred at another address, and the officers knew

he would be at the Lone Oak Drive address and that the residence was owned by his friend. After apprehending Duke, the officers entered the home of another man and trod through every room of his house, resulting in his arrest. The primary justification for their warrantless entry into his home was that Duke may have burglarized the home and hurt someone inside, even though the officers *expected* to find Duke at the residence, knew that the residence was owned by his friend, and observed no signs that another person was inside the home, injured or otherwise. The Supreme Court has been clear that "the Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant." *Payton*, 445 U.S. at 590, 100 S.Ct. 1371. Suppression of the evidence seized in this case may deter future constitutional violations by sending a clear message that officers must articulate *sincere* and *reasonable* exigent circumstances to justify crossing that sacred threshold without a warrant. Suppression of the evidence seized in this case also may deter future constitutional violations by conveying that officers may not sanitize an unconstitutional and unlawful search by obtaining a warrant through the misrepresentation of the facts surrounding the unlawful search to a magistrate. To find otherwise would undermine "[t]he bulwark of Fourth Amendment protection"—the Warrant Clause— which demands that the affiant make not only a "factual showing sufficient to comprise 'probable cause,'" but also that the affiant make "a *truthful* showing." *Franks v. Delaware*, 438 U.S. 154, 164–65, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978) (quoting *United States v. Halsey*, 257 F.Supp. 1002, 1005 (S.D.N.Y. 1966)).

## IV. CONCLUSION

Accordingly,

**IT IS ORDERED** that Defendant's **Motion to Suppress Evidence and Statements (Doc. 18)** is **GRANTED**.